UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| In Re: | : Chapter 11 |
| | : Case No. 23-20172-RLJ-11 |
| CAPROCK LAND COMPANY, LLC, | : |
| | : Northern District of Texas, |
| Debtor. | : Amarillo Division |

---

| | |
|---|---|
| STONEX COMMODITY SOLUTIONS LLC, f/k/a | : |
| FCSTONE MERCHANT SERVICES, LLC, - | : Adv. Proc. No. 23- |
| | : |
| Plaintiff, | : Removal from |
| | : Case No. 1:23-CV-07887 |
| -against- | : Pending in the United States |
| | : District Court, Southern District |
| CAPROCK MILLING & CRUSHING LLC, | : of New York |
| | : |
| Defendant. | : |
| | : |

---

## <u>NOTICE OF REMOVAL</u>

CapRock Milling & Crushing LLC ("Defendant") files this Notice of Removal, in support of which Defendant respectfully states as follows:

## I.  <u>BACKGROUND</u>

1.      On August 25, 2023, CapRock Land Company LLC (the "Debtor"), which is an affiliate of Defendant, filed a voluntary chapter 11 petition in the United States Bankruptcy Court for the Northern District of Texas, Amarillo Division ("Texas Bankruptcy Court"), thereby initiating the above-captioned bankruptcy case.

2.      A voluntary chapter 11 petition constitutes an order for relief under Section 301(b) of the United States Bankruptcy Code  (11 U.S.C. §§ 101, et seq., "Bankruptcy Code").

3.      On September 6, 2023, StoneX Commodity Solutions LLC, f/k/a FCStone Merchant Services LLC ("Plaintiff"), filed a Complaint against Defendant in the United States

District Court for the Southern District of New York ("District Court Case"), thereby initiating Case No. 1:23-cv-07887 ("Lawsuit").

4.       The Texas bankruptcy case was precipitated by Plaintiff and the claims it asserts against Debtor and certain of its members and other affiliates, including Defendant. This Lawsuit includes claims against Defendant on account of two contracts to which the Debtor in the Texas bankruptcy case is a party and that should be adjudicated by the Texas Bankruptcy Court as a core or related proceeding in that bankruptcy case.

5.       In its Complaint, Plaintiff asserts claims against Defendant for (a) breach of an express, written "grain storage" contract between Plaintiff, Debtor and Defendant, (b) related to a separate "Master Origination and Sale/Repurchase Agreement" entered into solely between Plaintiff and Debtor and to which Defendant is not a party, and (c) an alleged breach of the duty of care under the Uniform Commercial Code. A copy of the Complaint is attached as Exhibit A.

6.       The claims against Defendant in this Lawsuit are claims that should be adjudicated by the Texas Bankruptcy Court since the claims in this Lawsuit involve the same underlying transactions, agreements, events, and circumstances.

7.       Accordingly, following removal, Defendant intends promptly to seek transfer of this proceeding to the Texas Bankruptcy Court pursuant to 28 U.S.C.

8.       This notice of removal is filed less than 30 days after Defendant received service of the Complaint and therefore is timely filed in accordance with Federal Bankruptcy Rule of Procedure 9027.

## II.      <u>JURISDICTION</u>

9.       The Bankruptcy Court for the Southern District of New York (and following any transfer of venue to the Texas Bankruptcy Court will have) has jurisdiction over the Lawsuit under

28 U.S.C. § 1334(b) because the Lawsuit arises in or is related to a case under the Bankruptcy Code.

10.     The Lawsuit constitutes either a related proceeding under 28 U.S.C. § 157(a) or a core proceeding under 28 U.S.C. §157 (b)(2)(O).

11.     Removal of the Lawsuit to the Bankruptcy Court is therefore appropriate under 28 U.S.C. § 1452(a).

12.     To the extent the Bankruptcy Court determines that the Lawsuit is non-core, the Defendant consents to the entry of final orders and judgments by the Bankruptcy Court.

13.     A copy of the online docket for the District Court Case is attached hereto as Exhibit B. Copies of all pleadings, process, orders, and other filings in the District Court Case may be subsequently filed as a separate supplemental appendix if required by the Court or any applicable rules.

### III.     <u>PRAYER</u>

CONSIDERING THE FOREGOING, Defendant respectfully requests that the Lawsuit be removed to the Bankruptcy Court and that the Bankruptcy Court authorize and direct any further relief to which he may be entitled.

Dated: October 12, 2023                          Respectfully submitted,


Thomas E. Chase
Mark M. Rottenberg
Rottenberg Lipman Rich, P.C.
The Helmsley Building
230 Park Avenue, 18th Floor
New York, New York 10169
Email: mrottenberg@rlrpclaw.com
Phone: 212-661-3080
Fax: 646-203-0280
*Counsel for CapRock Milling & Crushing LLC*

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was served upon the following recipients by e-mail on October 12, 2023.

Morgan Fiander  
Polsinelli PC  
600 Third Avenue  
New York, NY 10016  
Email: mfiander@polsinelli.com  

Michael Schuster  
Polsinelli PC  
1401 Lawrence Street  
Suite 2300  
Denver, CO 80202  
Email: mschuster@polsinelli.com  

_____  
Thomas E. Chase

# Exhibit A

Morgan C. Fiander
POLSINELLI PC
600 Third Avenue, 42nd Floor
New York, New York 10016
(212) 684-0199
mfiander@polsinelli.com
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| StoneX Commodity Solutions LLC, f/k/a FCStone Merchant Services, LLC, <br><br> Plaintiff, <br><br> v. <br><br> CapRock Milling & Crushing, LLC, <br><br> Defendant. | Case No. |

## **COMPLAINT**

StoneX Commodity Solutions LLC, f/k/a FCStone Merchant Services, LLC ("**Plaintiff**"), by and through its undersigned counsel files this Complaint against CapRock Milling & Crushing, LLC ("**Defendant**"), and states as follows:

## **THE PARTIES, JURISDICTION & VENUE**

1.      Plaintiff is a Limited Liability Company formed under Delaware law.

2.      Plaintiff's sole member, Global Futures & Forex, Ltd., is a Michigan corporation.

3.      Defendant is a Limited Liability Company formed under Texas law.

4.      Defendant has two members: Thomas Bunkley III, an individual and citizen of the state of New Mexico; and Matt Keegan, an individual and citizen of the state of California.

5.      For diversity jurisdiction purposes, a limited liability company has the citizenship of its members. Therefore, Plaintiff's citizenship is Michigan, and Defendant's citizenship is New Mexico and California.

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because there exists complete diversity between Plaintiff (Michigan citizenship) and Defendant (New Mexico and California citizenships), and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

7. Venue is proper in this Court because the Plaintiff and Defendant have consented to venue in the state and federal courts located in the State of New York pursuant to the operative documents which are the subject of this action.

**FACTS SUPPORTING CLAIMS**

A. **The Master Agreement**

8. On or about October 13, 2022, Plaintiff and CapRock Land Company, LLC ("**CapRock Land**")[1] entered into an Amended and Restated Master Origination and Sale/Repurchase Agreement ("**Master Agreement**"). A true and correct copy of the Amended and Restated Master Origination and Sale/Repurchase Agreement is attached hereto as **Exhibit A.**

9. Pursuant to the Master Agreement, Plaintiff and CapRock Land agreed to enter into one or more transactions for the sale, purchase, storage, and/or delivery of certain quantities of Eligible Commodities ("**Commodity**"). Generally, the Commodity subject to the Master Agreement was organic cereal grain. Namely, corn, soybeans, soybean meal, and soybean oil.

10. Following Plaintiff's purchase of Commodity, the Master Agreement provided the mechanism for Plaintiff and CapRock Land to execute a corresponding forward sale for the quantity of the Commodity purchased by Plaintiff under the Master Agreement.

---

[1] Plaintiff asserts no cause of action against CapRock Land and seeks no relief against CapRock Land though this action, but reserves all rights under the Federal Rules of Civil Procedure and the Local Rules of this Court.

11.     The Master Agreement contemplated that Commodity owned by Plaintiff and subject to the Master Agreement would be stored in one or more approved storage facilities. Defendant leases and operates one such facility, located at 8911 Bethlehem Boulevard, Sparrows Point, Baltimore County, MD 21219 ("**Facility**").

**B.     The Organic Grain Storage Agreement**

12.     On or about December 9, 2020, Plaintiff, Defendant, and CapRock Land entered into an Amended and Restated Organic Grain Storage Agreement ("**Storage Agreement**"). A true and correct copy of the Storage Agreement is attached hereto as **Exhibit B**.

13.     The Storage Agreement implements certain terms of the Master Agreement regarding the storage of Commodity at Defendant's Facility. As relevant, the Storage Agreement provides that (i) Defendant agrees to provide discharge, storage, and load out services for Plaintiff's Commodity in Defendant's Facility in a professional manner using commercially reasonable industry best practices, (ii) Defendant acknowledges the existence of the Master Agreement and its binding terms with respect to the delivery and storage of Plaintiff's Commodity in Defendant's Facility; and (iii) Plaintiff agrees to pay an annual fee for the use of the Facility.

14.     The Storage Agreement also implements the terms of the Master Agreement which provide that Plaintiff owns exclusive title to Commodity unless and until it completes a forward sale of the Commodity to CapRock Land.

15.     Specifically, the Storage Agreement provides that: (i) Defendant shall notate on its books and records that the Commodity in storage at the Facility is owned by Plaintiff; (ii) Defendant shall mark the Commodity in a manner such that it is identifiable as owned by Plaintiff; (iii) Plaintiff shall retain exclusive title to the Commodity; (iv) Plaintiff shall have access to the Facility for inspections; and (v) Defendant shall be responsible for the proper care and custody of

3

the Commodity, and shall not remove the Commodity or release Commodity to any party without Plaintiff's express written consent.

16.     To ensure Defendant's performance of these duties, Defendant agreed to indemnify, defend, and hold Plaintiff harmless from liabilities, damages, claims, and expenses (including reasonable legal fees) incurred by Plaintiff due to: (i) any breach or nonperformance by Defendant under the Storage Agreement, or (ii) the negligence or willful misconduct of Defendant, its agents, employees, contractors, or invitees, including without limitation, any loss, claim, or damage to Commodity as a result of Defendant's breach, nonperformance, negligence or willful misconduct.

**C.      The Commodity Shortfall**

17.     Beginning in or about June 2023, Plaintiff became aware of a shortfall of its Commodity in Defendant's Facility ("**Shortfall**").

18.     In early August 2023, CapRock Land conceded to Plaintiff that there had been a Commodity loss, acknowledging that it could not locate all of Plaintiff's Commodity which was expected and required to be present at the Facility.

19.     Upon information and belief, Defendant caused or contributed to the Shortfall by removing Commodity and/or permitting the removal of Commodity from the Facility in violation of Plaintiff's ownership rights under the Master Agreement and the Storage Agreement.

20.     On August 23, 2023, Plaintiff sent Defendant a Notice of Default and Demand to Immediately Cease Deliveries.  Plaintiff informed Defendant of multiple breaches of the Storage Agreement arising from the Shortfall and demanded that Defendant cease any further shipments or deliveries of Commodity or other assets located in the Facility.

4

21. As of the date of this filing, Plaintiff continues to investigate the disposition and/or location of the Commodity missing from the Facility and the extent of the Shortfall.

## COUNT I – BREACH OF CONTRACT

22. Plaintiff incorporates the allegations in paragraphs 1-21 of this Complaint as if fully set forth herein.

23. Through the Storage Agreement, Defendant represented and warranted to Plaintiff that CapRock Land relinquished any control over Plaintiff's Commodity in the Facility.

24. Defendant breached its representations, warranties, and agreements by causing or contributing to the Shortfall and/or by removing Commodity or permitting the removal of Commodity from the Facility, in violation of Plaintiff's ownership rights under the Master Agreement and the Storage Agreement.

25. Pursuant to Section 11(1) of the Storage Agreement, Defendant is liable to Plaintiff for all damages, claims and expenses (including reasonable legal fees) due to Defendant's breach and nonperformance of its representations, warranties, covenants, and agreements under the Storage Agreement.

26. Pursuant to Section 11(2) of the Storage Agreement, Defendant is liable to Plaintiff for all damages, claims and expenses (including reasonable legal fees) arising from the Shortfall and resulting from Defendant's breach, nonperformance, negligence or willful misconduct.

27. Defendant failed to perform under and breached the Storage Agreement through its negligence or willful misconduct in causing or contributing to the Shortfall and/or by removing Commodity or permitting the removal of Commodity from the Facility.

28. Plaintiff's damages include the contract value of the missing Commodity subject to the Shortfall. Upon information and belief, the Deficit is approximately $8,785,521.00, subject to Plaintiff's completion of its investigation into the disposition and location of Commodity.

29.     Plaintiff has been damaged in an amount to be determined but which is no less than $8,785,521.00, and Defendant is liable to Plaintiff for this amount.

## COUNT II – BREACH OF DUTIES UNDER N.Y. UCC LAW § 7-204(A)

30.     Plaintiff incorporates the allegations of paragraphs 1 – 29 as if fully set forth herein.

31.     Pursuant to Section 12, the Storage Agreement is governed by the laws of the State of New York.

32.     Defendant is a person engaged in the business of storing goods for hire.

33.     Defendant failed to exercise due care with respect to the Commodity which a reasonably careful person would exercise under similar circumstances.

34.     Defendant is liable for Plaintiff's damages in an amount to be determined for the Shortfall caused by its failure to exercise due care as required by N.Y. UCC Law § 7-204(a).

WHEREFORE, Plaintiff StoneX Commodity Solutions LLC f/k/a FCStone Merchant Services, LLC respectfully requests entry of a money judgment against Defendant CapRock Milling & Crushing, LLC as set forth herein together with all interest, reasonable attorneys' fees, litigation costs, and other costs of collection, and such other and further relief as is proper.


Dated: New York, New York
      September 5, 2023

Respectfully submitted,

POLSINELLI PC

By: */s/ Morgan C. Fiander*
Morgan C. Fiander
600 Third Avenue, 42nd Floor
New York, NY 10016
Telephone: (212) 413-2838
mfiander@polsinelli.com

*Attorneys for Plaintiff*

6

# AMENDED AND RESTATED
## MASTER ORIGINATION AND SALE/REPURCHASE AGREEMENT

This Amended and Restated Master Origination and Sale/Repurchase Agreement (as amended, modified and supplemented from time to time, this "Master Agreement") is entered into as of  October 13, 2022  between StoneX Commodity Solutions, LLC, a Delaware limited liability company ("StoneX") and CapRock Land Company, LLC, a Texas limited liability company ("Customer").  StoneX and Customer are sometimes referred to individually as a "Party" or collectively as "Parties."

## RECITALS

**WHEREAS**, the Parties entered into that certain Master Purchase and Sale Agreement, dated August 31, 2018 (the "Original Agreement");

**WHEREAS**, the Parties desire to update the Original Agreement to amend certain provisions, including but not limited to, the addition of origination services to be provided by StoneX; and

**WHEREAS**, the Parties desire for this Master Agreement to supersede and replace the Original Agreement, where by all rights and obligations of the Parties under the Original Agreement shall now be governed by this Master Agreement.

## AGREEMENT

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are herby acknowledged, the Parties hereto agree as follows:

## ARTICLE 1

## SCOPE, DEFINITIONS AND TRANSACTION PROCEDURE

Section 1.1    Scope.  This Master Agreement governs each Transaction between the Parties for the purchase and sale of the Eligible Commodity, as identified by the Parties pursuant to the terms and conditions herein.

Section 1.2    Definitions.  All defined terms shall have the meanings set forth in Exhibit "A" hereto or in the Confirmation for a specific Transaction.

Section 1.3    Single Agreement.  The Parties may agree from time to time to enter into one or more Transactions, each of which shall be governed by this Master Agreement and the applicable Confirmation exchanged between the Parties.  If the terms of a Confirmation differ from this Master Agreement, the terms of the Confirmation shall control.  All Transactions are entered into in reliance on the fact that this Master Agreement

Doc ID: b10b96f1b97d89836785f3b4a78e0b71b2de0ce7

and all Confirmations form a single, integrated agreement between the Parties and, in the absence of the same forming such a single agreement, the Parties would not otherwise enter into any Transactions.

Section 1.4    Limited Undertaking.  Neither Party commits, by entering into this Master Agreement, to enter into any individual Transaction with the other Party.

Section 1.5    Oral Agreements and Confirmations.  A Transaction may be entered into upon oral or written agreement of the Parties to the material commercial terms and such agreement shall be binding and enforceable as of the time of oral agreement.  Upon receipt of a Confirmation from StoneX specifying the commercial terms above, Customer shall examine the terms of such Confirmation and, unless Customer objects in writing to the terms within two (2) Business Days after receipt of that Confirmation, those terms shall be deemed accepted and correct absent manifest error, in which case that Confirmation shall form a binding supplement to this Master Agreement.

Section 1.6    Oral Agreements Enforceable.  The Parties agree not to contest, or enter any defense concerning the validity or enforceability of any Transaction on the grounds that the Transaction fails to comply with the requirements of the statute of frauds or any other statute that agreements be written or signed.

Section 1.7    Eligibility.  Each Party represents and warrants that it will enter into Transactions under this Master Agreement only with respect to the Eligible Commodity.

Section 1.8    Reliance.  StoneX shall be entitled to rely upon and shall be fully protected in relying and shall not incur any liability for relying upon, any notice, request, communication, or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by a proper representative of Customer.  StoneX also may rely upon any statement made to it orally or by telephone and believed by it to have been made by a proper representative of Customer and shall be fully protected in relying on and shall not incur any liability for relying thereon.

# ARTICLE 2

# PURCHASE AND SALE TRANSACTIONS

To the extent that StoneX and Customer agree to enter into one or more Transactions in the Eligible Commodity as herein provided, such Transactions shall be conducted as follows:

Section 2.1    Inventory Purchase Transaction.

(a)    Purchase of the Stored Commodity.  On the Trade Date specified in a Confirmation, the Parties shall agree that Customer shall sell and deliver to StoneX, and StoneX shall purchase and receive from Customer, the Quantity of the Stored Commodity for the

-2-

Doc ID: b10b96f1b97d89836785f3b4a78e0b71b2de0ce7

applicable Transaction Purchase Price and on the Transaction Purchase Date (each, an "Inventory Purchase Transaction").

(b)     Applicable Title Documents.  Customer shall issue or shall cause to be issued (whether electronically or otherwise) to the order of StoneX one or more Applicable Title Documents to reflect Customer's sale and delivery and StoneX's purchase and receipt of the Stored Commodity.  Such Applicable Title Documents shall be delivered by Customer to StoneX or its designee on the Transaction Purchase Date specified in the applicable Confirmation.  Customer agrees to pay all costs and expenses associated with issuing the Applicable Title Documents.  The Applicable Title Documents must be in form and substance acceptable to StoneX in its sole discretion.

(c)     Purchase Payment.  The terms governing StoneX's payment to Customer for the Stored Commodity shall be specified in the applicable Confirmation.

(d)     Storage.  With respect to each Inventory Purchase Transaction, Customer or a Storage Facility Operator acceptable to StoneX in its sole discretion shall store the Stored Commodity for StoneX's account in an Approved Storage Facility and Customer or such Storage Facility Operator shall maintain the Stored Commodity in merchantable condition, and in compliance with the terms hereof and the terms of the applicable Storage Facility Operator's schedule of rates and industry standards.  Furthermore, the Stored Commodity will not be comingled with commodities owned by or pledged to parties other than StoneX.

(e)     Storage Fees.  With respect to each Inventory Purchase Transaction, StoneX and Customer shall agree to any storage, elevation, handling and other fees applicable to the Stored Commodity sold to StoneX in the relevant Confirmation or otherwise as agreed between the Parties, and which fees and costs shall be passed through to Customer and invoiced to Customer from time to time as such amounts are paid by StoneX.  Notwithstanding the foregoing, StoneX and Customer agree that Customer shall be responsible for and shall release, defend, indemnify and hold StoneX Indemnified Parties harmless for any fees applicable to the Stored Commodity, including but not limited to any fees related to: (i) Services that StoneX contests in good faith were not rendered by a Storage Facility Operator; (ii) Services prepaid by a third party; (iii) Services that were not authorized by StoneX under the terms of this Master Agreement or otherwise; (iv) invoices received twelve (12) months after the date the Services were rendered; or (v) Services rendered in relation to Stored Commodity that a Storage Facility Operator fails or refuses to deliver into an Approved Storage Facility. In the event Customer is required to make payments to a Storage Facility Operator at an Approved Storage Facility, Customer represents and warrants that it will comply with all requirements under the storage agreement, including but not limited to making all payments in accordance therewith, and in the event Customer becomes aware that has breach the relevant storage agreement, Customer shall (i) immediately take all actions necessary to remedy the breach, and (ii) immediately notify StoneX of such breach. Failure to act or notify StoneX under these circumstances shall be an explicit breach of this Agreement.

(f)     Title.  Except as otherwise agreed in the Confirmation of any Inventory Purchase Transaction, title to the Stored Commodity shall transfer from Customer to StoneX immediately upon StoneX' payment of the Transaction Purchase Price for any Inventory Purchase Transaction.

Doc ID: b10b96f1b97d89836785f3b4a78e0b71b2de0ce7

(g) <u>Insurance</u>.

(i) With respect to each Inventory Purchase Transaction, Customer or the Storage Facility Operator shall provide or shall cause its designee to provide a certificate of insurance to StoneX evidencing coverage against casualty loss to StoneX and Customer as is consistent with good industry practices and acceptable to StoneX in its reasonable discretion, including but not limited to coverage against loss or damage as a result of fire, water damage, lightning, windstorm, cyclone, tornado or inherent explosion or other similar event in amounts and reflecting StoneX as loss payee with respect to all policies covering the Stored Commodity.

(ii) <u>Subrogation and Notice</u>. The insured (Customer and the Storage Facility Operator, as applicable) will procure an agreement from its insurer that the insurer shall give StoneX at least 30 days written notice of any cancellation, non-renewal, or material change to the terms of such policies (or 10 days written notice if such cancellation is for non-payment of premium). Except where prohibited by law, the insured shall require its insurer to waive all rights of subrogation against StoneX's insurer and StoneX.

Section 2.2    <u>In-Transit Purchase Transaction</u>

(a) <u>Purchase of the In-Transit Commodity</u>. On the Trade Date specified in a Confirmation, the Parties shall agree that Customer shall sell and deliver to StoneX, and StoneX shall purchase and receive from Customer, the Quantity of the In-Transit Commodity for the applicable Transaction Purchase Price and on the Transaction Purchase Date (the "<u>In-Transit Purchase Transaction</u>").

(b) <u>Bills of Lading</u>. Customer shall issue or shall cause to be issued to the order of StoneX a full set of Bills of Lading to reflect Customer's sale and delivery and StoneX's purchase and receipt of the In-Transit Commodity. Such Bills of Lading shall be delivered by Customer to StoneX or its designee on the Transaction Purchase Date specified in the applicable Confirmation. Customer agrees to pay all costs and expenses associated with issuing the Bills of Lading. All Bills of Lading issued for Eligible Commodity shall only be issued, at such times and in such form, as directed by StoneX. The Bills of Lading must be in form and substance acceptable to StoneX in its sole discretion.

(c) <u>Payment</u>. The terms governing StoneX's payment to Customer for the In-Transit Commodity shall be specified in the applicable Confirmation.

(d) <u>Title</u>. Except as otherwise agreed in the Confirmation of any In-Transit Purchase Transaction, title shall transfer from Customer to StoneX with respect to the In-Transit Commodity immediately upon StoneX's receipt of the Bills of Lading.

(e) <u>Conveyance</u>. With respect to each In-Transit Purchase Transaction, unless the Eligible Commodity is earlier re-purchased by Customer, Customer or a third party acceptable to StoneX in its sole discretion shall transport the Eligible Commodity to an Approved Storage Facility for StoneX's account for the term of the applicable In-Transit Purchase Transaction.

Doc ID: b10b96f1b97d89836785f3b4a78e0b71b2de0ce7

(f) <u>Conveyance Fees</u>. With respect to each In-Transit Purchase Transaction, StoneX and Customer shall agree to any storage, elevation, handling and other fees applicable to the In-Transit Commodity sold to StoneX in the relevant Confirmation or otherwise as agreed between the Parties. Notwithstanding the foregoing, StoneX and Customer agree that StoneX shall not be liable for any fees applicable to the In-Transit Commodity, including but not limited to any fees related to: (i) Services that StoneX contests in good faith were not rendered by the applicable third party; (ii) Services prepaid by a third party; (iii) Services that were not authorized by StoneX under the terms of this Master Agreement or otherwise; (iv) invoices received twelve (12) months after the date the Services were rendered; (v) Services rendered in relation to Eligible Commodity the applicable third party fails or refuses to deliver or load out; or (vi) Services rendered in relation to Eligible Commodity for which StoneX does not hold a Bill of Lading.

(g) <u>Insurance</u>. With respect to each In-Transit Purchase Transaction, Customer or the applicable merchant seaman or other third party shall provide or shall cause its designee to provide a certificate of insurance to StoneX evidencing coverage against casualty loss to StoneX and Customer, including but not limited to coverage against loss or damage as a result of shipwreck, fire, water damage, lightning, windstorm, cyclone, tornado or inherent explosion or other similar event in customary amounts and covering customary risks, and reflecting StoneX as loss payee with respect to all policies covering the In-Transit Commodity.

(h) <u>Fees and Charges</u>. The Parties agree that Customer shall be responsible for all fees and charges with the In-Transit Commodity, including but not limited to any freight and terminal handling costs, demurrage, marine insurance, costs associated with moving the Eligible Commodity into an Approved Storage Facility and any related inland transportation costs, and any costs or losses related to any delayed or refused admission into a port of destination by reason of any violation of Applicable Laws.

(i) <u>Storage</u>. Upon notification and acceptance by StoneX, with respect to an In-Transit Purchase Transaction, Customer or a party acceptable to StoneX in its sole discretion shall deliver the In-Transit Commodity to an Approved Storage Facility in accordance with and pursuant to the terms of the applicable Confirmation and such Eligible Commodity shall, upon delivery, be deemed a Stored Commodity and maintained in accordance with Sections 2.1(d), (e) and (g).

Section 2.3 <u>Origination Transaction</u>.

(a) <u>Origination of Eligible Commodity</u>. From time to time during the term of this Master Agreement, StoneX shall endeavor to identify quantities of an Eligible Commodity that may be acquired on a spot or term basis from one or more Third Party Suppliers for purchase by StoneX and forward sale to Customer hereunder. StoneX shall negotiate with any such Third Party Supplier regarding the price and other terms of a potential Procurement Contract based on the procurement needs and price parameters provided to StoneX by Customer in writing. All Procurement Contracts entered into by StoneX shall be binding on Customer. For the avoidance of doubt, Customer shall have no authority to bind StoneX to, or enter into on StoneX's behalf, any Procurement Contract, and Customer shall not represent to any third party that it has such authority.

-5-

Doc ID: b10b96f1b97d89836785f3b4a78e0b71b2de0ce7

(b)     Purchase of the Eligible Commodity.  On the Trade Date specified in a Procurement Contract, the Third Party Supplier under such Procurement Contract shall sell and deliver to StoneX, and StoneX shall purchase and receive from such Third Party Supplier, the Quantity of the Eligible Commodity for the applicable price and on the applicable date set forth in the Procurement Contract (each, an "Origination Transaction").  Concurrently with or following such Origination Transaction, StoneX and Customer shall enter into a corresponding forward sale for such Quantity of the Eligible Commodity pursuant to Section 2.4. With respect to each Origination Transaction, Third Party Supplier or a party acceptable to StoneX in its sole discretion shall deliver the Eligible Commodity to an Approved Storage Facility in accordance with and pursuant to the terms of the applicable Confirmation and such Eligible Commodity shall, upon delivery, be deemed a Stored Commodity and maintained in accordance with Sections 2.1(d), (e) and (g).

(c)     Title and Risk of Loss.  With respect to each Origination Transaction, title and risk of loss to the Eligible Commodity shall transfer from the Third Party Supplier to StoneX pursuant to the terms and conditions of the applicable Procurement Contract.

(d)     Non-Conformance.  Where Eligible Commodity is delivered pursuant to an Origination Transaction that does not meet the specifications set forth in StoneX's Procurement Contract, such delivery shall be handled in accordance with Section 3.3 below. In addition, at StoneX's discretion, Customer will be responsible for and will release, defend, indemnify and hold the StoneX Indemnified Parties harmless from all Liabilities associated with the removal and/or disposal of any non-conforming product from the Approved Storage Facility, and the handling of all claims against the Third Party Supplier or any other party.

(e)     Quality and Quantity Claims Related to Origination Transactions.

(i)     The failure of any Eligible Commodity (related to an Origination Transaction) that StoneX hereunder sells to Customer to meet the Quantity or quality specifications or other requirements applicable thereto as stated in StoneX's Procurement Contract for that Eligible Commodity shall be for the sole account of Customer and shall not entitle Customer to any reduction in the amounts due by it to StoneX hereunder; provided, however, that any claims made by StoneX with respect to such non-conforming Eligible Commodity shall be for Customer's account and resolved in accordance with Section 3.3.

(ii)     To the extent that Customer believes that any claim should be made by StoneX for the account of Customer against any third party (whether a Third Party Supplier or otherwise), and subject to Section 3.3, StoneX will take any commercially reasonable actions as requested by Customer either directly, or by allowing Customer to do so, to prosecute such claim, in each such case at Customer's sole cost and expense, and all recoveries resulting from the prosecution of any such claim shall be for the account of Customer.

(iii) StoneX shall, in a commercially reasonable manner, cooperate with Customer in prosecuting any such claim and shall be entitled to assist in the prosecution of such claim at Customer's sole cost and expense.

Doc ID: b10b96f1b97d89836785f3b4a78e0b71b2de0ce7

(iv) Notwithstanding anything in this Master Agreement to the contrary, (i) StoneX shall not be liable for, and shall have no obligation to prosecute or pursue, any damages or claims made, alleged, or otherwise asserted by Customer or arising with respect to any Eligible Commodity that is the subject of a Procurement Contract to the extent that such damages or claims are not recoverable by StoneX from the Third Party Supplier from whom the underlying Eligible Commodity was purchased by StoneX, and (ii) StoneX may notify Customer that StoneX is retaining control over the resolution of any claim referred to in Section 3.3 if StoneX, in its reasonable judgment, has determined that it has commercially reasonable business considerations for doing so based on any relationships that StoneX or any of its Affiliates had, has or may have with the third party involved in such claim; provided that, subject to such considerations, StoneX shall use commercially reasonable efforts to resolve such claim, at Customer's expense and for Customer's account.

(f)      Non-Circumvention.  StoneX agrees that it shall not purchase organic commodities purchased under this Master Agreement from Third Party Suppliers for any reason other than to fulfill StoneX's obligations under this Master Agreement during the term of this Master Agreement or for a period of three (3) years following a termination by StoneX.

Section 2.4      Sale Transaction.

(a)      Sale of Eligible Commodity.  On or after the Trade Date of any Purchase Transaction, the Parties shall enter into one or more Confirmations setting forth the terms of a corresponding forward sale of the related Eligible Commodity, pursuant to which StoneX shall sell and deliver to Customer, and Customer shall purchase and receive from StoneX, as is and where is, irrespective of loss, destruction, theft or damage thereto (but accounting for any insurance proceeds with respect thereto actually paid to StoneX's account), and irrespective of the quality thereof and whether or not there shall be existing any event of Force Majeure, the Purchased Commodity at the applicable Transaction Sale Price as set forth therein (the "Sale Transaction"). If Customer fails to repurchase the entire quantity of the Purchased Commodity in accordance with a Sale Transaction, in addition to the remedies available to StoneX under Article 7 of this Master Agreement, at StoneX's sole discretion, StoneX may cancel the related Sale Transaction, without penalty, and enter into a principal sale to any third party for the remaining quantity (a "Third Party Sale").  Customer acknowledges and agrees that StoneX's right to enter into a Third Party Sale is not limited to a single sale, and StoneX may continue to enter into Third Party Sales until the entire remaining quantity of Purchased Commodity is sold.

(b)      Transaction Sale Price.  The terms governing Customer's payment to StoneX for the Purchased Commodity shall be specified in the applicable Confirmation.

(c)      Surrender of Eligible Commodity and Title and Risk of Loss.  For so long as Customer is not in default hereunder, Customer will schedule the delivery of quantities of Purchased Commodity in coordination with the Storage Facility Operator, if applicable. Except as agreed in any Confirmation of the Sale Transaction, upon exchange of Applicable Title Documents, title and risk of loss in such Purchased Commodity shall transfer to and vest in Customer. At and after transfer of any Purchased Commodity, Customer shall be solely responsible for compliance with all applicable laws, including all Environmental Laws pertaining to the

Doc ID: b10b96f1b97d89836785f3b4a78e0b71b2de0ce7

possession, handling, use and processing of such Purchased Commodity and shall release, defend, indemnify and hold the StoneX Indemnified Parties harmless, for all Liabilities directly or indirectly arising therefrom except to the extent such Liabilities are caused by or attributable to the gross negligence or willful misconduct of any StoneX Indemnified Party.

(d)    Force Majeure.  StoneX under any Sale Transaction shall not be liable to Customer under such Sale Transaction for any loss or damage which may be suffered by Customer as a result of a failure on the part of StoneX to effect delivery of the Eligible Commodity in accordance with the terms of any Transaction Document by reason of delivery being prevented, hindered, delayed or rendered illegal by circumstances or events beyond the control of StoneX, whether foreseeable or not, including but not limited to acts of God, war, whether declared or not, warlike operations, terrorism, riot, insurrection, strike, lock-out, trade disputes or labor disturbance, industrial action, accident, shipwreck, break-down of plant or machinery, failure of transport or storage, casualty or delay to any conveyance including arrest thereof, fire, flood, earthquake, storm, hurricane, blockade, embargo, prohibition of import or export, actions or omissions of any governmental or quasi-governmental body, including any agency thereof, refusal by any authority to grant, renew, extend or maintain any license or any other circumstances whatsoever affecting the supply or delivery of the Eligible Commodity (a "Force Majeure").

## ARTICLE 3

## COMMODITY TRANSACTION TERMS

Each Transaction shall be made on the following terms:

Section 3.1    Applicable Trade Rules.  The Parties hereby incorporate by reference the National Grain and Feed Association Trade Rules (the "Applicable Trade Rules"), as they may be updated and amended from time to time and in their most current version.  In the event of a conflict between the Applicable Trade Rules and any provision in this Master Agreement or a Confirmation hereunder, the provisions of this Master Agreement and/or such Confirmation shall govern the Parties' obligations, including but not limited to any provisions herein regarding payment obligations, title transfer, insurance requirements, risk of loss, indemnification, Events of Default and any calculation of a Net Settlement Amount.

Section 3.2    Merchantable Quality.  Customer shall warrant, represent and assure that all of the Eligible Commodity sold by Customer meets the specifications set forth in the Confirmation and unrestricted from movement and sale under all Applicable Laws, and accepted industry rules and practices, including but not limited to the Applicable Trade Rules.

Section 3.3    Damage.  Where Eligible Commodity is delivered to StoneX by Customer that does not meet the specifications set forth in the Confirmation, such delivery shall be considered under-delivered and handled in accordance with Section 3.4 below. In addition, at StoneX's discretion, Customer will be responsible for and will release, defend, indemnify and hold StoneX Indemnified Parties harmless from all costs, fees,

-8-

losses, or other damages associated with removal and/or disposal of any non-conforming product from the Approved Storage Facility.

Section 3.4    Settlement for Under deliveries; Substitution.  All deliveries of Eligible Commodity made by Customer under this Master Agreement shall be for the quality and Quantity specified in the applicable Confirmation.  If, under the applicable Transaction, Customer will not be able to complete delivery of the contracted quality and Quantity, Customer shall so advise StoneX immediately.  StoneX, upon notification or knowledge of such under-delivery, shall by the close of the next Business Day elect either to:  (a) agree with Customer upon an extension of the time for delivery; or (b) determine the Market Value of the undelivered portion of the Eligible Commodity.  In the event StoneX elects to determine the Market Value of the undelivered portion of the Eligible Commodity, then (i) the Transaction Purchase Price required to be paid by StoneX shall be reduced by the Market Value of the undelivered portion of the Eligible Commodity, and if the Transaction Purchase Price has been previously paid by StoneX, a refund paid to StoneX equal to the Market Value of the undelivered portion of the Eligible Commodity, and (ii) the corresponding Sale Transaction shall be amended automatically to reflect the reduction in the quality and/or Quantity of the Eligible Commodity as a result of such under deliveries.  The remedies provided for hereunder will be in addition to those available at law or in equity for under-deliveries.

Section 3.5    Payment Netting.  The Parties hereby agree that they shall discharge mutual debts and payment obligations due and owing to each other on the same date pursuant to all Transactions through netting, so that all amounts owed by each Party to the other Party under this Master Agreement on the same date shall be netted and automatically satisfied and discharged and replaced by the obligation that only the excess amount remaining due shall be required to be paid on such date by the Party who owes such excess amount.

Section 3.6    Interest on Late Payments.  If any payment under any Transaction Document is not paid in full when due, interest on the unpaid portion shall accrue from the date due until the date of payment at a rate equal to the lower of (i) the then-effective prime rate of interest publicly announced plus five percent per annum; or (ii) the maximum applicable lawful interest rate.

Section 3.7    Taxes; Additional Amounts.

(a)    Except as required by law, any and all payments to StoneX hereunder or under any related agreement shall be made free and clear of and without deduction or withholding for or on account of any and all present or future Taxes.  If any Taxes are required to be deducted or withheld, or are otherwise levied or imposed on or with respect to payments to StoneX hereunder, Customer agrees to (i) notify StoneX, (ii) make such deductions and withholdings and pay the full amount of such Taxes to the appropriate Governmental Authority and to pay to StoneX such additional amounts as may be necessary so that after making all required deductions, withholdings, and payments with respect to Non-Excluded Taxes, StoneX receives an amount (after all Taxes of any kind imposed by any jurisdiction on amounts payable under this Section 3.7) equal to the sum it would have received had no such Non-Excluded Taxes been imposed, and

Doc ID: b10b96f1b97d89836785f3b4a78e0b71b2de0ce7

(iii) promptly furnish to StoneX certified copies of tax receipts evidencing such payment by Customer.

(b)       Customer hereby agrees to pay any present or future stamp, recording, documentary, excise, filing, intangible, property or value-added taxes, or similar taxes, charges or levies that arise from any payment made under or in respect of this Master Agreement or any related agreement or from the execution, delivery, enforcement or registration of, any performance, receipt or perfection of a security interest under, or otherwise with respect to, this Master Agreement or any related agreement (collectively, "Other Taxes").

(c)       Customer agrees to pay any sales, use, excise, gross receipts, ad valorem, property or other Taxes (that are Non-Excluded Taxes) imposed with respect to the Eligible Commodity ("Eligible Commodity Taxes").

(d)       Customer shall release, indemnify, defend and hold harmless the StoneX Indemnified Parties, and reimburse StoneX upon its written request, for the amount of any Non-Excluded Taxes, Eligible Commodity Taxes, and Other Taxes, and the full amount of Taxes of any kind imposed by any jurisdiction on amounts payable under this Section 3.7, and any liability (including penalties, additions to Tax, interest and expenses) arising therefrom or with respect thereto, regardless of whether the Non-Excluded Taxes, Eligible Commodity Taxes, Other Taxes, or other liabilities for which indemnity is sought have been correctly or legally asserted.  Customer shall have the right to subrogation against StoneX for indemnity amounts paid by Customer under this Section 3.7(d) that have not been correctly or legally asserted.

(e)       StoneX shall promptly provide, upon request of Customer, any applicable certificates or documentation necessary or useful to establish or document any available exemptions from Taxes, Other Taxes, and Eligible Commodity Taxes for which Customer would be required to pay additional amounts to or indemnify StoneX, and shall cooperate with Customer to minimize all such Taxes, provided that StoneX shall not be required to take any action pursuant to this paragraph that is materially prejudicial to the legal or commercial position of StoneX.

## ARTICLE 4

## TERM

Section 4.1      Term.  This Master Agreement shall become effective as of the date first set forth above, and shall continue thereafter unless and until terminated as provided herein.

Section 4.2      Notice of Termination.  StoneX shall have the right to terminate this Master Agreement upon thirty (30) days' prior written notice to Customer; provided, however, that the term for each Transaction shall be governed by the terms thereof and, except as provided in Article 7, no termination of this Master Agreement under this clause shall be effective until the completion and satisfaction of all obligations with respect to all Transactions entered into under this Master Agreement.  For the avoidance of doubt, no new Transactions may be entered into after receipt of such notice.

-10-

Doc ID: b10b96f1b97d89836785f3b4a78e0b71b2de0ce7

# ARTICLE 5

## MUTUAL REPRESENTATIONS AND WARRANTIES

Section 5.1    Mutual Representations and Warranties.    Each Party represents and warrants to the other Party as of the date of this Master Agreement and on the date of each Transaction hereunder, that:

(a)    It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing;

(b)    It has the power to execute each Transaction Document or other document relating hereto to which it is a party, to deliver each Transaction Document or other document relating hereto that it is required hereby to deliver, to perform its obligations under each Transaction Document or other document relating hereto to which it is a party, and has taken all necessary action to authorize such execution, delivery and performance;

(c)    Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(d)    Its obligations under each Transaction Document constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application regardless of whether enforcement is sought in a proceeding in equity or at law);

(e)    There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that may reasonably be expected to affect the legality, validity or enforceability against it of any Transaction Document to which it is a party or its ability to perform its obligations under the same or to have a material adverse effect on any of the Transactions;

(f)    It (i) has entered into each applicable Transaction Document as a principal (and not as an advisor, agent, broker or in any other capacity, fiduciary or otherwise) and with a full understanding of the material terms and risks of the same, and (ii) is capable of assuming those risks, and has made its decisions based upon its own judgment and any advice from such advisors as it has deemed necessary and not in reliance upon any representations of the other Party other than those expressly set forth in the Transaction Documents;

(g)    It is a "forward contract merchant", "master netting agreement participant", and/or a "financial participant" within the meaning of the Bankruptcy Code;

(h)    All Transactions constitute "forward contracts" within the meaning of the Bankruptcy Code, and "forward contracts" and sales of a nonfinancial commodity for deferred

-11-

Doc ID: b10b96f1b97d89836785f3b4a78e0b71b2de0ce7

shipment or delivery that, when made, are intended to be physically settled within the meaning of the Commodity Exchange Act, as amended;

(i)       This Master Agreement constitutes a "master netting agreement" within the meaning of the Bankruptcy Code;

(j)       Upon an Act of Insolvency with respect to a Party, the other Party is entitled to exercise its rights and remedies under this Master Agreement in accordance with the safe harbor provisions of the Bankruptcy Code governing forward contracts and master netting agreements as set forth in, among other provisions, Sections 362(b)(6), 362(b)(27), 546(e), 546(j), 548(d)(2), 556 and 561 thereof; and

(k)       For each Transaction contemplating physical settlement under this Master Agreement, it has the capacity to make or take, as applicable, physical delivery of the Eligible Commodity in accordance with such Transaction, and is entering into such Transaction with the intent of making or taking such physical delivery; and

(l)       Customer and StoneX intend that each Purchase Transaction under this Master Agreement constitutes the true sale of the Eligible Commodity for all purposes, which sale is absolute and not in the nature of a secured transaction and which sale provides StoneX with the full benefits of ownership, notwithstanding any storage arrangement or future sale of any of the Eligible Commodity (after becoming Stored Commodity) from StoneX to Customer entered into in connection with this Master Agreement. To protect StoneX in the event that this Master Agreement is for any reason (other than for tax purposes) characterized in whole or in part as a secured transaction and not a true sale by a court of competent jurisdiction, without derogation to the intent of the Parties that this Master Agreement constitutes a true sale of the Eligible Commodity the subject of the applicable Confirmation, this Master Agreement shall constitute a security agreement under the applicable UCC and Customer hereby grants to StoneX a security interest in all of the present and future rights of Customer, if any, in and to the following:  (i) all Stored Commodity (ii) all Eligible Commodity from time to time purchased from Customer by StoneX; (iii) all Applicable Title Documents and other documents (including all title documents and bills of lading) issued with respect to, or otherwise relating to, any Stored Commodity or other Eligible Commodity; (iv) accounts and general intangibles (including payment intangibles) relating to any such Stored Commodity or other such Eligible Commodity, including as a result of the sale or other disposition of any Stored Commodity or other Eligible Commodity and including all liens and similar rights to secure the payment of any such accounts, whether arising by contract, operation of law, or otherwise; (v) all letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), supporting obligations, and other contract rights and rights to the payment of money, in each case relating to any of the foregoing assets; (vi) all instruments (including promissory notes), securities, securities accounts, and all other investment property, in each case solely to the extent received in satisfaction of, or in lieu of payment for, or otherwise received in respect of or constituting proceeds of, any of the foregoing assets; (vii) all insurance claims and proceeds relating to any of the foregoing assets; (viii) all additions and accessions to, substitutions for, and replacements, products and proceeds of, any and all of the foregoing assets, including, but not limited, any insurance proceeds with respect thereto; (ix) to the extent not otherwise described herein, all fixtures and personal property of every kind and nature including all accounts, goods (including inventory and equipment), documents (including, if applicable, electronic documents),

Doc ID: b10b96f1b97d89836785f3b4a78e0b71b2de0ce7

instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, general intangibles (including all payment intangibles), money, deposit accounts, and any other contract rights or rights to the payment of money; (x) to the extent not otherwise described herein, all proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions of and to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Grantor from time to time with respect to any of the foregoing; and (xi) all other assets of Customer (collectively, the "<u>Subject Assets</u>"). This security interest shall secure all present and future obligations of Customer to StoneX, arising under or in connection with this Master Agreement and the other Transaction Documents, and whether matured or unmatured, liquidated or unliquidated or absolute or contingent. Customer authorizes StoneX to file financing statements or other similar documents against Customer covering the Eligible Commodity in applicable UCC filing records and in other filing and recording offices, and Customer shall take all action reasonably requested by StoneX to establish StoneX's title to the Stored Commodity and the applicable Confirmation, and perfect a first priority security interest in favor of StoneX in the Subject Assets. With respect to StoneX's security interest in the Subject Assets, StoneX shall have, in addition to the rights and remedies under this Master Agreement, all rights and remedies provided to a secured creditor under the applicable UCC and other Applicable Laws, which rights and remedies shall be cumulative.

(m) Without in any way limiting StoneX's rights under Article 7 or elsewhere in this Master Agreement, StoneX shall have the right, at any time and from time to time, to send notice of the assignment of, and StoneX's security interest in and Lien on, any accounts constituting Subject Assets to any and all account debtors (including any Assigned Contract End-Buyer) obligated on such accounts and to any other Person having or claiming an interest in any such Subject Assets. After the occurrence and during the continuance of any Event of Default, StoneX shall have the sole and exclusive right to collect such accounts and to take possession of any Subject Assets. Customer shall permit StoneX, and hereby irrevocably authorizes StoneX, in Customer's name, in StoneX's name, or in the name of a nominee or designee of StoneX, to contact any account debtors (including any Assigned Contract End Buyer) obligated on any accounts constituting Subject Assets to verify the validity, amount, or any other matter relating to any such account, by mail, telephone, email, facsimile transmission or otherwise, and to direct such account debtors to make payment directly into the Control Account or as StoneX may otherwise direct such account debtors in its sole discretion.

## ARTICLE 6

## CUSTOMER REPRESENTATIONS, WARRANTIES AND COVENANTS

Section 6.1    <u>Customer Assurances</u>. Customer represents and warrants to StoneX as of the date of this Master Agreement and on the date of each Transaction hereunder that:

(a)    No Event of Default with respect to Customer, or event which with notice and/or lapse of time would constitute an Event of Default, has occurred and is continuing and no

-13-

Doc ID: b10b96f1b97d89836785f3b4a78e0b71b2de0ce7

such event or circumstance would occur as a result of its entering into or performing its obligations under any Transaction Document to which it is a party;

(b)    If Customer is storing the Eligible Commodity, Customer represents and warrants that it is duly licensed under Applicable Law to store the Eligible Commodity, has complied with all applicable licensure, bonding insurance and regulatory requirements applicable thereto, and is storing any such Eligible Commodity in an Approved Storage Facility;

(c)    All Applicable Title Documents issued or caused to be issued by Customer shall be valid, genuine, in compliance with all Applicable Laws and regulations, and reflect actual commodities of the grade, quality and quantity described;

(d)    All Bills of Lading issued or caused to be issued by Customer shall be valid, genuine, in compliance with all Applicable Laws and regulations, and reflect the grade, quality and quantity of the commodity described, owned by Customer and in transit to its facilities or at other facilities acceptable to StoneX;

(e)    The Eligible Commodity is of the quality and grade stated in the applicable Confirmation and complies with the requirements of all Applicable Laws;

(f)    No termination event, acceleration, event of default, or event which with notice and/or lapse of time would constitute an event of default has occurred and is continuing;

(g)    On the date hereof, the date of each Transaction and Transaction Purchase Date, Customer, individually and consolidated with its subsidiaries, is Solvent;

(h)    Customer warrants that at the time of delivery it will have good title to the Eligible Commodity, it will deliver to StoneX good title to the Eligible Commodity free from all liens, security interests, encumbrances, claims or any interest therein arising prior to the point of delivery, and that Customer has the right to sell to StoneX the Eligible Commodity specified in the applicable Confirmation; and

(i)    Neither Customer, nor any Person owning an equity interest in Customer, (i) is in violation of any of the country or list-based economic and trade sanctions administered and enforced by OFAC, (ii) is a Prohibited Person, (iii) engages in any transactions or dealings with any Prohibited Person, (iv) has any assets located in or with any Prohibited Person, or (v) derives revenues from investments in, or transactions with, any Prohibited Person.

Section 6.2    Customer Covenants. Customer covenants to StoneX and agrees, at all times, that:

(a)    Preservation of Existence, Etc.  Customer shall preserve and maintain its corporate, partnership or limited liability company (as the case may be) existence and all material rights (charter and statutory) and franchises;

(b)    Compliance with Laws, Etc.  Customer shall comply and cause each of its subsidiaries to comply, in all material respects, with Applicable Law, with such compliance to

-14-

Doc ID: b10b96f1b97d89836785f3b4a78e0b71b2de0ce7

include compliance with ERISA, applicable environmental laws, and laws, rules, and regulations relating to Hazardous Substances;

(c)    <u>Performance and Compliance with Other Agreements</u>.  Customer shall perform and comply, and cause each of its subsidiaries to perform and comply, with the provisions of each indenture, credit agreement, contract or other agreement by which it is bound, the non-performance of or non-compliance with which would result in a material adverse change;

(d)    <u>Additional Agreements with Storage Facility Operator</u>.  Customer shall cause all Stored Commodity to at all times be held and stored with a Storage Facility Operator at an Approved Storage Facility subject to a Commodity Access Agreement.  StoneX may, in its sole discretion, require additional agreements be put in place between StoneX and Customer and/or any Storage Facility Operator.  Customer consents to StoneX contacting a Storage Facility Operator for such purposes and will cooperate with and assist StoneX in obtaining such additional agreements;

(e)    <u>Maintenance of Insurance</u>.  Customer shall maintain, and cause each of its subsidiaries and any Storage Facility Operator to maintain, insurance with responsible and reputable insurance companies or associations in accordance with Section 2.1(g) of this Master Agreement; and

(f)    <u>Assigned Contract End-Buyers</u>.  Contemporaneous with this Agreement, Customer and StoneX signed the Assignment of Subject Contracts, whereby Customer agrees, upon a Event of Default under this Agreement, to assign all of its rights and interest in and to all forward sale contracts for Eligible Commodities between customer and third-party end-buyers (each, a "Subject Contract") to StoneX. Customer represents and warrants that it shall ensure all Subject Contacts include notices, acknowledgements or any other necessary language to ensure StoneX maintains its assignee rights under the Assignment of Subject Contracts.

(g)    <u>Control Account</u>.  Upon notice from StoneX, Customer will instruct and otherwise cause all customers from time to time purchasing any Purchased Commodity, to make all payments in respect thereof directly to the Control Account.  To the extent Customer is in possession of all or any portion of any such payment, Customer agrees to promptly notify StoneX thereof, hold such amounts in trust for the benefit of StoneX in a segregated account, and promptly remit all such amounts (with any necessary endorsement) to the Control Account;

(h)    <u>Payment of Taxes, Etc</u>.  Customer (i) has timely paid and will timely pay and discharge, before the same shall become delinquent, (A) all Taxes, assessments and governmental charges or levies imposed upon it or upon its property and (B) all lawful claims that, if unpaid, might by law become a lien upon its property; provided, however, that neither Customer shall be required to pay or discharge any such Tax, assessment, charge or claim that is being contested in good faith and by proper proceedings and as to which adequate reserves are being maintained in accordance with GAAP, unless and until any Lien resulting therefrom attaches to its property and becomes enforceable against its other creditors, (ii) has timely filed and will timely file, and has caused and will cause each of its subsidiaries to timely file, all Tax returns required to be filed by it; (iii) promptly after the filing thereof, will provide copies of all excise tax returns required to be filed by it, including any such returns relating to any rebates claimed in respect of

Doc ID: b10b96f1b97d89836785f3b4a78e0b71b2de0ce7

exported fuel for which an exemption is available; and (iv) promptly upon StoneX's request therefor, will provide evidence to StoneX that all excise tax payments then due and payable have been timely made; and

(i)     Adequate Assurances.  Within one Business Day of StoneX's request, Customer will provide adequate assurances of its ability to perform any of its obligations under this Master Agreement when StoneX has reasonable grounds for insecurity with respect to the performance by Customer of its obligations under this Master Agreement (including as a result in a change in the creditworthiness of Customer or any credit-support provider of Customer). Adequate assurance will be collateral in the form of cash, irrevocable letter-of-credit or other security, in amount, for a term, and from an issuer, all as reasonably acceptable to StoneX.  During the pendency of a reasonable request by StoneX to Customer for adequate assurances of Customer's ability to perform its obligations under this Master Agreement, StoneX may, at its election and without penalty, suspend its obligations under this Master Agreement.

(j)     Organic Certificate. Customer shall: (a) maintain compliance with all provisions of the National Organic Program, and (b) maintain, at all times, and make available to StoneX, such documents as are required to verify the organic nature of the Eligible Commodity.

(k)     Reporting Requirements.  Customer shall provide to StoneX in writing: (a) monthly, management prepared, financial statement within forty-five (45) days of month's end, (b) annual audited financial statements within one hundred and fifty (150) days of (fiscal) year's end, (c) monthly accounts receivable ageing report, (d) monthly (or as reasonably requested by StoneX) copies of all Customer sales contracts and summarized aggregate forward purchase and sale schedules, and (e) monthly (or as reasonably requested by StoneX) inventory reports. All statements and reports shall be in such form and contain such substance reasonably acceptable to StoneX.

Section 6.3     Limitations on Liens. Customer shall not (a) create, incur, assume or suffer to exist any Lien on or with respect to any of the Subject Assets, any accounts receivable of Customer arising with respect thereto, any other Subject Assets, or any proceeds or accounts related thereto whether now owned or hereafter acquired; (b) sign or file, under the UCC of any jurisdiction, a financing statement that names Customer as debtor and includes the Subject Assets in the description of collateral set forth in such financing statement, or sign, any security agreement authorizing any secured party thereunder to file such financing statement, or suffer to exist any of the aforementioned financing statements or security agreements without diligently taking commercially reasonable actions to remove the same; or (c) sell, assign, transfer, or otherwise dispose of any of the assets comprising all or any portion of the Subject Assets without StoneX's express written consent.

Section 6.4     Limitation of Warranties.  OTHER THAN THE EXPRESS WARRANTIES MADE BY THE PARTIES IN THIS MASTER AGREEMENT, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, THE SELLING PARTY UNDER THE APPLICABLE TRANSACTION MAKES NO OTHER REPRESENTATION OR WARRANTY, WRITTEN OR ORAL, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY REPRESENTATION OR WARRANTY THAT THE

Doc ID: b10b96f1b97d89836785f3b4a78e0b71b2de0ce7

COMMODITY WILL BE EITHER SALEABLE OR FIT OR SUITABLE FOR A SPECIFIC PURPOSE, EVEN IF SUCH PURPOSE IS KNOWN TO SELLER, UNLESS OTHERWISE STATED IN THE CONFIRMATION FOR A PARTICULAR TRANSACTION.

Section 6.5    <u>Disclaimer of Warranties</u>.    StoneX SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS AND WARRANTIES WRITTEN AND ORAL, EXPRESS OR IMPLIED, WITH RESPECT TO PURCHASED COMMODITY.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, StoneX SPECIFICALLY DISCLAIMS ANY REPRESENTATION THAT THE PURCHASED COMMODITY IS OF THE QUALITY AND GRADE STATED IN THE APPLICABLE CONFIRMATION, THAT THEY COMPLY WITH THE REQUIREMENTS OF ANY APPLICABLE LAW, THAT THEY WILL BE EITHER SALEABLE OR FIT OR SUITABLE FOR A SPECIFIC PURPOSE EVEN IF SUCH PURPOSE IS KNOWN TO CUSTOMER OR THAT THEY ARE FREE AND CLEAR OF ANY LIENS.

## ARTICLE 7

## EVENTS OF DEFAULT, REMEDIES AND INDEMNIFICATION

Section 7.1    If an Event of Default has occurred and is continuing as set forth in this Master Agreement with respect to Customer (the "<u>Defaulting Party</u>"), StoneX (the "<u>Non-Defaulting Party</u>") shall have the right to designate a Business Day as an early termination date (the "<u>Early Termination Date</u>") for the liquidation and termination of all Transactions under this Master Agreement (each a "<u>Terminated Transaction</u>").

Section 7.2    As of the Early Termination Date, the Non-Defaulting Party shall determine, in good faith and in a commercially reasonable manner, (i) the amount owed (whether or not then due) by each Party with respect to all of the Eligible Commodity delivered and received between the Parties under Terminated Transactions on and before the Early Termination Date and all other applicable charges relating to such deliveries and receipts, for which payment has not yet been made by the Party that owes such payment under this Master Agreement and (ii) the Market Value, as defined below, of each Terminated Transaction.  The Non-Defaulting Party shall liquidate and accelerate each Terminated Transaction at its Market Value, so that each amount equal to the difference between such Market Value and the Contract Value, as defined below, of such Terminated Transaction(s) shall be due to the buyer under the Terminated Transaction(s) if such Market Value exceeds the Contract Value and to the seller if the opposite is the case.

Section 7.3    "<u>Contract Value</u>" means the amount of the Eligible Commodity remaining to be delivered or purchased under a Transaction multiplied by each Transaction Purchase Price or the Transaction Sale Price, as applicable.  "<u>Market Value</u>" means the amount of the Eligible Commodity remaining to be delivered or purchased under a Transaction multiplied by the market price for a similar transaction determined by the Non-Defaulting Party in a commercially reasonable manner.

Doc ID: b10b96f1b97d89836785f3b4a78e0b71b2de0ce7

Section 7.4    The Non-Defaulting Party shall net or aggregate, as appropriate, any and all amounts owing between the Parties, so that all such amounts are netted or aggregated to a single liquidated amount payable by one Party to the other (the "<u>Net Settlement Amount</u>").  At its sole option, and without prior notice to the Defaulting Party, the Non-Defaulting Party is hereby authorized to setoff (i) any Net Settlement Amount against any amount(s) owed by or to a Party under any other agreement or arrangement between the Parties;  (ii) any Net Settlement Amount owed to the Non-Defaulting Party against any amount(s) owed by the Non-Defaulting Party or its Affiliates to the Defaulting Party under any other agreement or arrangement; and/or (iii) any Net Settlement Amount owed to the Defaulting Party against any amount(s) owed by the Defaulting Party to the Non-Defaulting Party or its Affiliates under any other agreement or arrangement.

Section 7.5    If any obligation that is to be included in any netting, aggregation or setoff hereunder is unascertained, the Non-Defaulting Party may in good faith estimate that obligation and net, aggregate or setoff, as applicable, in respect of the estimate.

Section 7.6    If the Defaulting Party disputes the Non-Defaulting Party's calculation of the Net Settlement Amount, in whole or in part, the Defaulting Party shall, within one (1) Business Day of receipt of Non-Defaulting Party's calculation of the Net Settlement Amount, provide to the Non-Defaulting Party a detailed written explanation of the basis for such dispute; provided, however, that if the Net Settlement Amount is due from the Defaulting Party, the Defaulting Party shall first transfer collateral in the form of cash or other security acceptable to the requesting party to the Non-Defaulting Party in an amount equal to the Net Settlement Amount.

Section 7.7    As soon as practicable after a liquidation, written notice shall be given by the Non-Defaulting Party to the Defaulting Party of the Net Settlement Amount, and whether the Net Settlement Amount is due to or due from the Non-Defaulting Party. The notice shall include a written statement explaining the calculation of the Net Settlement Amount, provided that failure to give such notice shall not affect the validity or enforceability of the liquidation or give rise to any claim by the Defaulting Party against the Non-Defaulting Party.  The Net Settlement Amount as adjusted by any setoffs applied against such amount, shall be paid by the close of business on the first (1st) Business Day following such notice, which date shall not be earlier than the Early Termination Date. Interest on any unpaid portion of the Net Settlement Amount as adjusted by setoffs shall accrue from the date of the Event of Default until the date of payment at a rate equal to the lower of (i) the then-effective prime rate of interest, plus five percent per annum; or (ii) the maximum applicable lawful interest rate.

Section 7.8    Notwithstanding anything to the contrary herein, the Non-Defaulting Party in its sole discretion shall be entitled to sell, at the Defaulting Party's sole cost and expense, any Applicable Title Document or Bills of Lading associated with any Eligible Commodity in accordance with accepted industry rules and practices.  Any costs, fees, tariffs and expenses incurred by the Non-Defaulting Party as a result of loading out such Eligible Commodity shall be for the account of the Defaulting Party and the Non-

Doc ID: b10b96f1b97d89836785f3b4a78e0b71b2de0ce7

Defaulting Party shall be entitled to recover from the Defaulting Party any such costs, fees, tariffs and expenses so incurred.

Section 7.9    The Non-Defaulting Party's remedies under this Section 7 shall include all remedies it may have, including without limitation, all rights, setoffs, counterclaims and other defenses that it is or may be entitled to arising from this Master Agreement and the Transactions hereunder.  Such costs, fees and expenses shall include any storage, elevation, handling, loading and other fees, any taxes, or any costs associated with transporting, handling and disposing of the Eligible Commodity from the storage facility or Approved Storage Facilitys, and all reasonable attorneys' fees and expenses incurred by the Non-Defaulting Party in connection with the termination of this Master Agreement, including, without limitation, any brokerage fees, breakage costs, commissions and other similar third party transaction costs and expenses reasonably incurred by such party either in terminating any arrangement pursuant to which it has hedged its obligations or entering into new arrangements which replace a Terminated Transaction.

Section 7.10    <u>Duty to Mitigate</u>.  Each Party agrees that it has a duty to mitigate damages and covenants that it will use commercially reasonable efforts to minimize any damages it may incur as a result of an Event of Default involving the other Party.

Section 7.11    <u>INDEMNIFICATION</u>.  CUSTOMER AGREES, TO THE FULLEST EXTENT PERMITTED BY LAW AND REGARDLESS OF THE PRESENCE OR ABSENCE OF INSURANCE, TO RELEASE, DEFEND, INDEMNIFY AND HOLD STONEX, ITS DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS (EACH, AN "INDEMNIFIED PARTY") HARMLESS FROM ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION, LOSSES, LIABILITIES, CHARGES, DAMAGES, DEFICIENCIES, ASSESSMENTS, INTERESTS, FINES, PENALTIES, COSTS AND EXPENSES (INCLUDING COURT COSTS, ANY COST OR EXPENSE OF INCIDENT INVESTIGATION AND REASONABLE ATTORNEY'S FEES), INCLUDING, WITHOUT, LIMITATION, ANY LIABILITY ARISING FROM OR ON ACCOUNT OF INJURY, DEATH OR DAMAGE, WHICH ARISE FROM, RELATE TO OR OCCUR IN CONNECTION WITH (I) ANY BREACH BY CUSTOMER OF ANY COVENANT, AGREEMENT, REPRESENTATION OR WARRANTY CONTAINED HEREIN OR MADE IN CONNECTION HEREWITH, (II) THE RECEIPT, TRANSPORTATION, HANDLING, STORAGE, DISPOSAL OR DELIVERY OF ANY ELIGIBLE COMMODITY OR PURCHASED COMMODITY, INCLUDING PURSUANT TO ANY ARRANGEMENT BETWEEN CUSTOMER AND ANY STORAGE FACILITY OPERATOR, OR ANY OTHER THIRD PARTY, (III) CUSTOMER'S NEGLIGENCE OR WILLFUL MISCONDUCT, (IV) ANY FAILURE BY CUSTOMER OR A STORAGE FACILITY OPERATOR OR ANY OTHER PARTY TO COMPLY WITH OR OBSERVE ANY APPLICABLE LAW, (V) CUSTOMER OR ITS EMPLOYEES, REPRESENTATIVES, AGENTS OR CONTRACTORS EXERCISING ANY RIGHTS OR PERFORMING ANY OBLIGATIONS HEREUNDER OR IN CONNECTION HEREWITH, (VI) ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS SUBSTANCES IN CONNECTION WITH THIS MASTER AGREEMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY, OR ANY LIABILITY UNDER ANY ENVIRONMENTAL LAW RELATED IN ANY WAY TO OR

Doc ID: b10b96f1b97d89836785f3b4a78e0b71b2de0ce7

ASSERTED IN CONNECTION WITH THIS MASTER AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, OR (VII) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY, WHETHER BROUGHT BY A THIRD PARTY OR BY CUSTOMER, AND REGARDLESS OF WHETHER STONEX IS A PARTY THERETO.

**Section 7.12 <u>EXPRESS NEGLIGENCE</u>. IT IS THE EXPRESS INTENTION OF THE PARTIES HERETO THAT EACH INDEMNIFIED PARTY SHALL BE RELEASED, DEFENDED, INDEMNIFIED FROM AND HELD HARMLESS AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION, LOSSES, LIABILITIES, CHARGES, DAMAGES, DEFICIENCIES, ASSESSMENTS, INTERESTS, FINES, PENALTIES, COSTS AND EXPENSES (INCLUDING COURT COSTS, ANY COST OR EXPENSE OF INCIDENT INVESTIGATION AND REASONABLE ATTORNEY'S FEES) ARISING FROM, RELATING TO OR OCCCURING IN CONNECTION WITH THE SOLE, CONTRIBUTORY, COMPARATIVE, CONCURRENT OR ORDINARY NEGLIGENCE OF SUCH PARTY (OR THE REPRESENTATIVES OF SUCH PARTY); PROVIDED THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNIFIED PARTY, BE AVAILABLE TO THE EXTENT SUCH CLAIMS, DEMANDS, CAUSES OF ACTION, LOSSES, LIABILITIES, CHARGES, DAMAGES, DEFICIENCIES, ASSESSMENTS, INTERESTS, FINES, PENALTIES, COSTS AND EXPENSES (INCLUDING COURT COSTS, ANY COST OR EXPENSE OF INCIDENT INVESTIGATION AND REASONABLE ATTORNEY'S FEES) ARISE FROM, RELATE TO OR OCCUR IN CONNECTION WITH THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNIFIED PARTY AS DETERMINED BY THE FINAL, NON-APPEALABLE JUDGMENT OF A COURT OF COMPETENT JURISDICTION.**

Section 7.13   <u>Limitations of Liability</u>.  StoneX SHALL NOT BE LIABLE TO CUSTOMER UNDER ANY TRANSACTION DOCUMENT FOR ANY CLAIM FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES WHETHER THE CLAIM IS BASED ON CONTRACT, TORT, STRICT LIABILITY, OR OTHER THEORY, AND IN ANY EVENT STONEX'S LIABILITY UNDER THIS MASTER AGREEMENT AND IN CONNECTION WITH ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY SHALL NOT EXCEED THE NET AMOUNT OWED TO StoneX BY CUSTOMER PURSUANT TO THIS MASTER AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS.

## ARTICLE 8

## NOTICES AND PAYMENTS

Section 8.1   <u>Methods</u>.    All invoices, statements, notices, and communications made pursuant to this Master Agreement shall be in writing and made as follows:  all written communications to the other Party shall be sent (i) by first class,

Doc ID: b10b96f1b97d89836785f3b4a78e0b71b2de0ce7

registered, certified or express mail, return receipt requested, postage prepaid, (ii) by comparable delivery service such as overnight courier services, (iii) by hand, (iv) by facsimile (with the original sent by first class mail), or (v) to the email address set forth below.  Such notice shall be deemed to have been given on the date of the delivery thereof to the party receiving such notice.  A Party may change its address upon notice to the other Party.

|  |  |
|---|---|
| StoneX: | StoneX Commodity Solutions LLC |
|  | 1251 NW Briarcliff Parkway |
|  | Suite 800 |
|  | Kansas City, Missouri 64116 |
|  | ATTN:        Brent Grecian |
|  | PHONE:     816-410-7123 |

*With mandatory copy (for legal notices only) to:*

StoneX Commodity Solutions LLC
1251 NW Briarcliff Parkway
Suite 800
Kansas City, Missouri 64116
ATTN:        Contracts Group
PHONE:     816-410-7145
EMAIL: dg-rkcontracts@stonex.com

|  |  |
|---|---|
| Customer: | CapRock Land Company, LLC |
|  | 1615 South Bryan Street, #28 |
|  | Amarillo, TX 79102-2327 |
|  | EMAIL: rprinz@caprockgrain.com |
|  | ATTN: Ryan Prinz |
|  | PHONE: 780-265-3227 |

## ARTICLE 9

## GENERAL PROVISIONS

Section 9.1    <u>Entire Agreement and Counterparts</u>.  The terms of this Master Agreement and the Confirmation for any Transaction entered into pursuant to this Master Agreement constitute the entire agreement between the Parties with respect to the matters set forth in this Master Agreement and with respect to such Transaction and supersede any and all negotiations, agreements, and expressions of intent, written or oral, prior hereto. This Master Agreement may be changed only by written agreement executed after the date hereof by the Parties or, in the case of an oral modification for a specific Transaction, in accordance with Section 1.5.    This Master Agreement, the Confirmation for any Transaction, and any modification of the foregoing may be executed and delivered in

Doc ID: b10b96f1b97d89836785f3b4a78e0b71b2de0ce7

counterparts, including by a facsimile or email transmission thereof, each of which shall be deemed an original.

Section 9.2    <u>No Waiver</u>.  No waiver by either Party of any one or more defaults by the other Party in the performance of any of the provisions of this Master Agreement or the Confirmation for a Transaction shall operate or be construed as a waiver of any other default or defaults whether of a like kind or different nature.

Section 9.3    <u>Headings</u>.  The headings used for the articles and sections herein are for convenience only and shall not affect the meaning or interpretation of the provisions of this Master Agreement or any Transaction or Confirmation hereunder.

Section 9.4    <u>Recording</u>.  Each Party (i) consents to the recording of telephone conversations between the trading, marketing and other relevant personnel of the Parties or any of their Affiliates in connection with this Master Agreement or any Transaction or potential Transaction, (ii) agrees to obtain any necessary consent of, and give any necessary notice of such recording to, its relevant personnel and those of its Affiliates and (iii) agrees, to the extent permitted by Applicable Law, that such recordings may be submitted in evidence in any proceedings.

Section 9.5    <u>No Partnership</u>.  Nothing in this Master Agreement or any Confirmation shall be construed to create a partnership or joint venture between the Parties.

Section 9.6    <u>Effect of Regulatory or Judicial Actions</u>.  The invalidity of any provision of any Transaction Document due to any Change in Law shall not affect the validity of the remaining provisions hereof; provided, however, that if, due to a Change in Law (i) it becomes illegal or impossible for one or both Parties to perform one or more of its material obligations hereunder, (ii) a Party is deprived of a material portion of the benefit of its bargain hereunder or (iii) a Governmental Authority or Exchange imposes position limits or similar trading restrictions on a Party that limits the Party's ability to enter into Transactions, then the affected Party (or either Party if both Parties are affected) may send a written notice to the other Party describing in reasonable detail the Change in Law and the relevant effect on such Party (a "<u>Change-In-Law Notice</u>").  A Change-In-Law Notice may not be sent more than thirty (30) days after the Change in Law has become effective.

Upon the receipt of a Change-In-Law Notice:

(1)    the Parties shall negotiate in good faith to amend the Transaction Document in a manner that allocates the economic benefits and burdens of the Change in Law equally between the Parties; and

(2)    if the Parties are unable to agree upon an amendment to the Transaction Document within thirty (30) days of the receipt of a Change-In-Law Notice, then StoneX may issue a notice to Customer stating that it intends to terminate all outstanding Transactions and designating a termination date on which to terminate all, and no less than all, Transactions.

Doc ID: b10b96f1b97d89836785f3b4a78e0b71b2de0ce7

Section 9.7     GOVERNING LAW; JURY TRIAL WAIVER; Venue.

(a)     THIS MASTER AGREEMENT AND THE RIGHTS AND DUTIES OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED, ENFORCED AND PERFORMED IN ACCORDANCE WITH THE LAWS OF THE STATE OFGoverning Law, WITHOUT REGARD ITS CONFLICTS OF LAWS PRINCIPLES. EACH PARTY WAIVES ITS RESPECTIVE RIGHT TO ANY JURY TRIAL WITH RESPECT TO ANY LITIGATION ARISING UNDER OR IN CONNECTION WITH THIS MASTER AGREEMENT.

(b)     EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY TRANSACTION DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY TRANSACTION DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 8.8(b) WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

(c)     Each party hereto hereby acknowledges that (i) the negotiation, execution, and delivery of the Transaction Documents constitute the transaction of business within the State of Texas, (ii) any cause of action arising under any of said Transaction Documents will be a cause of action arising from such transaction of business, and (iii) each party understands, anticipates, and foresees that any action to enforce any of the Transaction Documents (including the payment of any obligations or liabilities under any Transaction Document) may be brought against it in the State of Texas. To the extent allowed by Applicable Law, each party hereby submits to jurisdiction in the State of Texas for any action or cause of action arising out of or in connection with the Transaction Documents and waives any and all rights under the laws of any state or jurisdiction to object to jurisdiction or venue within Harris County, Texas. Notwithstanding the foregoing, nothing contained in this Section 8.8(c) shall prevent StoneX from bringing any action or exercising any rights against Customer or any other Person, or any Subject Assets, in any other county, state, or jurisdiction. Initiating such action or proceeding or taking any such action in any other state or jurisdiction shall in no event constitute a waiver by StoneX of any of the foregoing.

Section 9.8     No Third Party Beneficiaries. This Master Agreement and any Confirmation pursuant hereto confer no rights whatsoever upon any Person other than the Parties and shall not create, or be interpreted as creating, any standard of care, duty or liability to any Person not a Party hereto.

Section 9.9     Binding Effect. This Master Agreement shall be binding on and inure to the benefit of the Parties and their respective successors and permitted assigns,

-23-

Doc ID: b10b96f1b97d89836785f3b4a78e0b71b2de0ce7

except as expressly provided in this Master Agreement or the Confirmation for a specific Transaction.

Section 9.10f  <u>Assignment</u>.  This Master Agreement shall not be assigned by either Party without the written consent of the other Party, which consent shall not be unreasonably withheld; provided, however, either Party may, without the consent of the other Party, transfer, pledge or assign this Master Agreement to an Affiliate provided such Affiliate's creditworthiness is equal to or greater than that of the assigning party at the time of such transfer. Further, StoneX may assign this Master Agreement without consent for the benefit of StoneX's creditors.  In such event, StoneX shall give notice as soon as practical to the other Party.

*(Signature page to follow)*

-24-

Doc ID: b10b96f1b97d89836785f3b4a78e0b71b2de0ce7

Duly and fully authorized representatives of the Parties have signed and delivered this Master Origination and Sale/Repurchase Agreement as of the date first set out above.

**StoneX Commodity Solutions LLC**

By: *Jeff Akin*

Name: Jeff Akin

Title: Legal Counsel

Date: 10 / 18 / 2022

By: *Ernesto Rambaldini*

Name: Ernesto Rambaldini

Title: Senior VP

Date: 10 / 13 / 2022

**CapRock Land Company, LLC**

By: *Thomas Bunkley*

Name: Thomas Bunkley III

Title: Manager

Date: 10 / 13 / 2022

Doc ID: b10b96f1b97d89836785f3b4a78e0b71b2de0ce7

# EXHIBIT "A"

## DEFINITIONS

The terms defined under this Master Agreement include the plural as well as the singular. The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Master Agreement as a whole and not to any particular Article, Section or other subdivision unless otherwise specified. As used in the Master Agreement, the following defined terms have the meanings set forth below:

"Act of Insolvency" means (a) making a general assignment for the benefit of, or entering into a reorganization, arrangement or composition with creditors, (b) admitting in writing the inability to pay debts as they become due, (c) seeking, consenting to or acquiescing in the appointment or any trustee, administrator, receiver or liquidator for yourself or your assets, or (d) the voluntary or involuntary commencement of any case or proceeding under any state or federal bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution or similar laws, including, without limitation, the Bankruptcy Code.

"Affiliate" means, in relation to any Person, any entity controlled, directly or indirectly, by the Person, any entity that controls, directly or indirectly, the Person, or any entity directly or indirectly under common control with the Person. For this purpose, "control" of any Person means ownership of a majority of the voting power of the Person.

"Applicable Law" means any present or future international, federal, state or local laws (including common law and criminal law), statutes, treaties, codes, regulations, rules, tariffs, guideline, policy, ordinance, by-law, charter, judgment, order, and directive (as modified by the practice of any relevant Governmental Authority), or any rule of common law, issued, followed or promulgated by a Governmental Authority, or any rule or practice of an Exchange, the Applicable Trade Rules, and any judicial or administrative interpretation of the foregoing.

"Applicable Title Document" means a title document for an Eligible Commodity as accepted by StoneX in its sole discretion. Applicable Title Documents shall include but not limited to, certificates of origin, phyto certificate (if required by Applicable Law), valid organic certificate, 3rd party genetically modified testing including pesticide and herbicide results, confirmation of cargo release by the appropriate authorities, bill of lading, and sales contracts between Customer and the ultimate end buyer of the Eligible Commodity.

"Approved Storage Facility" means any storage facility that is approved by StoneX in its sole discretion.

"Assigned Contract End Buyer" means the purchasing party under a Subject Contract.

"Assignment of Subject Contracts" means that certain Assignment signed by StoneX and Customer, signed on the same date as this Agreement.

-1-

Doc ID: b10b96f1b97d89836785f3b4a78e0b71b2de0ce7

"Bankruptcy Code" means Title 11 of the United States Code as amended from time to time.

"Bill of Lading Act" means the United States Bill of Lading Act, 49 U.S.C. Section 80101, et. seq.

"Bills of Lading" means negotiable bills of lading that are (i) issued by Customer or a merchant seaman, as applicable, in accordance with the Bill of Lading Act, (ii) against stocks held in Customer's or such merchant seaman's vessels, (iii) in the name or the party provided by StoneX, and (iv) without any stated limitation or restriction.

"Business Day" means a 24-hour period ending at 5:00 p.m. E.P.T. on a weekday on which banks are open for general commercial business in New York.

"Change in Law" means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any Applicable Law (or in the application or official interpretation of any Applicable Law) that occurs on or after the date of this Master Agreement.

"Change-In-Law Notice" has the meaning specified in Section 9.6..

"Commodity Access Agreement" means an access agreement, landlord waiver or subordination, bailee letter, or other agreement in form and substance satisfactory to StoneX, executed by each Storage Facility Operator, lessor, warehouseman, bailee, or other Person in possession of, having a Lien upon, or having rights or interests in, any Eligible Commodity or any other applicable assets of Customer, in each case, in favor of StoneX with respect to the Eligible Commodity or other applicable assets in the custody, control or possession of such Person.

"Confirmation" means the written notice confirming the terms of an Inventory Purchase Transaction or In-Transit Purchase Transaction or a written notice confirming the terms of a Sale Transaction, in the form as provided by StoneX.

"Contract Value" has the meaning specified in Section 7.3.

"Control Account" means a lockbox or a blocked account owned by or otherwise subject to the sole and exclusive dominion and control of StoneX and maintained with a commercial bank approved by StoneX.

"Credit Event Upon Merger" shall mean that Customer has consolidated or amalgamated with, merged with or into, or transferred all or substantially all of its assets or business (whether by sale, lease or other disposition, in a single transaction or a series of transactions) to, another entity, and either (i) on or before the date of such action, the resulting, surviving or transferee entity fails to assume all of the obligations of such Person under this Master Agreement and each other Transaction Document as such Person is party to, as the case may be, either by operation of law or by agreement satisfactory to StoneX, or (ii) in the reasonable opinion of StoneX, the creditworthiness of the successor, surviving or transferee entity, taking into account any guaranty, collateral or other credit support provided to StoneX, is materially weaker than immediately prior to such consolidation, amalgamation, merger or transfer.

Doc ID: b10b96f1b97d89836785f3b4a78e0b71b2de0ce7

"Cross Default Threshold" means, with respect to StoneX, not applicable, and with respect to Customer, an amount equal to one hundred thousand dollars ($100,000.00), provided that for any Specified Indebtedness payable by Customer to StoneX, to any of StoneX's Affiliates, or to any third party, Cross Default Threshold means any amount of such Specified Indebtedness.

"Customer" has the meaning set forth in the preamble.

"Defaulting Party" has the meaning specified in Section 7.1.

"Early Termination Date" has the meaning specified in Section 7.1.

"Eligible Commodity" means any commodity described in a Confirmation between the Parties and that is subject to the provisions contained in this Master Agreement.

"Eligible Commodity Taxes" has the meaning specified in Section 3.7(c).

"Environmental Laws" means any and all federal, state, and local Laws, regulations, judicial decisions, orders, decrees, plans, rules, permits, licenses, and other governmental restrictions and requirements pertaining to health, safety, or the environment, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 et seq., the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq., the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq., the Clean Air Act, 42 U.S.C. § 7401 et seq., the Clean Water Act, 33 U.S.C. § 1251 et seq., and the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.

"ERISA" means Employee Retirement Income Security Act of 1974 found in Title 29 of the United States Code as amended from time to time

"Event of Default" means the occurrence of any of the following events with respect to Customer:

(a)     Customer fails to make a payment due by it under or in relation to this Master Agreement, any Transaction hereunder, or any other Transaction Document;

(b)     Customer fails to comply with or perform any other agreement, covenant or obligation under this Master Agreement, any Transaction hereunder or any other Transaction Document, which failure is not remedied within one (1) Business Day after it is notified thereof, or Customer repudiates or challenges the validity of this Master Agreement, any Confirmation or any Transaction or any other Transaction Document;

(c)     Any representation or warranty made (or deemed made) by Customer in this Master Agreement or any other Transaction Document is incorrect or untrue in any material respect when made (or deemed made), and if capable of being remedied, is not remedied within one (1) Business Day after Customer is notified thereof, respectively;

(d)     An Act of Insolvency by Customer;

Doc ID: b10b96f1b97d89836785f3b4a78e0b71b2de0ce7

(e)     A Credit Event Upon Merger shall occur with respect to Customer; provided, however, that if such Party posts sufficient collateral in a form and amount determined by StoneX in its sole discretion within one (1) Business Day of such StoneX's request for collateral, then such Credit Event Upon Merger shall not constitute an Event of Default hereunder;

(f)     Customer, (i) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Specified Indebtedness having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than the Cross Default Threshold, or (ii) fails to observe or perform any other agreement or condition relating to any such Specified Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs; the effect of which default or other event is to cause, or to permit the holder or holders of such Specified Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Specified Indebtedness to be demanded or to become due or to be sold, prepaid, defeased or redeemed (automatically or otherwise), or an offer to sell, prepay, defease or redeem such Specified Indebtedness to be made, prior to its stated maturity;

(g)     In relation to Customer, (i) there is a breach of or a default under any Specified Transaction and any applicable cure period shall have elapsed or there occurs any liquidation or early termination of that Specified Transaction; (ii) there is a default, after giving effect to any applicable notice requirement or cure period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least two (2) Business Days if there is no applicable notice requirement or cure period); or (iii) there is a disaffirmation, disclaimer, repudiation or rejection of a Specified Transaction, in whole or in part; and

(h)     Customer fails to comply with or perform any agreement or obligation to be complied with or performed by Customer under this Master Agreement.

"Exchange" means any commodity exchange on which a futures contract for an Eligible Commodity is traded.

"StoneX" has the meaning set forth in the preamble.

"StoneX Indemnified Parties" means StoneX, its Affiliates, and all of its and their respective equity owners, directors, partners, members, managers, officers, representatives, agents and employees.

"Force Majeure" has the meaning specified in Section 2.4(d).

"GAAP" means generally accepted accounting principles, consistently applied.

"Governmental Authority" means any (i) international, national, state, county, city, town, municipal or other governing organization; (ii) governmental or quasi-governmental authority of any nature (including any agency, branch, department, board, commission, court, tribunal or other entity exercising governmental or quasi-governmental powers); (iii) body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power (including any standard-setting organization or self-regulatory organization); or (iv) official of any of the foregoing.

"Hazardous Substance" means any substance, product, waste, pollutant, material, chemical, contaminant, constituent, or other material which is or becomes listed, regulated, or addressed under any Environmental Law, including, without limitation, asbestos, petroleum, and polychlorinated biphenyls.

"In-Transit Commodity" means the Eligible Commodity sold by Customer and purchased by StoneX in any In-Transit Purchase Transaction under this Master Agreement which is in-transit to an Approved Storage Facility operated by Customer or a Storage Facility Operator or will otherwise be repurchased by Customer while the same is still in-transit.

"In-Transit Purchase Transaction" has the meaning specified in Section 2.2(a).

"Inventory Purchase Transaction" has the meaning specified in Section 2.1(a).

"Liabilities" means any and all liabilities, obligations, losses, damages, claims, demands, causes of action, judgments, charges, violations, assessments, penalties, fines, payments, costs and expenses, including reasonable attorneys' fees and legal or other expenses incurred in connection therewith.

"Lien" means any mortgage, pledge, hypothecation, collateral assignment, encumbrance, lien (statutory or other), charge or other security interest or any other security agreement of any kind.

"Market Value" has the meaning specified in Section 7.3.

"Master Agreement" has the meaning set forth in the preamble.

"Net Settlement Amount" has the meaning specified in Section 7.4.

"Non-Defaulting Party" has the meaning specified in Section 7.1.

"Non-Excluded Taxes" means any Taxes, other than a Tax imposed on or measured by the net income or net profits of StoneX, franchise taxes imposed in lieu of net income taxes, or branch taxes, in each case, by the jurisdiction (or any political subdivision thereof) under the laws of which StoneX is organized.

"OFAC" means the Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Origination Transaction" has the meaning specified in Section 2.3(b).

"Other Taxes" has the meaning specified in Section 3.7(b).

"Party" or "Parties" has the meaning set forth in the preamble.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, cooperative association, Governmental Authority or any other entity.

"Procurement Contract" means any procurement contract with a Third Party Supplier entered into by StoneX for the purchase of Eligible Commodity for forward sale to Customer.

"Prohibited Person" means any Person that (a) is a Sanctioned Entity or a Sanctioned Person, (b) is specifically named or listed in, or otherwise prohibited from engaging in transactions with StoneX due to, any Anti-Terrorism Laws, (c) is owned or controlled by, or acting for or on behalf of, any Person specifically named or listed in, or otherwise prohibited from engaging in transactions with StoneX due to, any Anti-Terrorism Laws, (d) StoneX is prohibited from dealing with, or engaging in any transaction with, pursuant to any Anti-Terrorism Laws, or (e) is affiliated with any Person described in *clauses (a)-(d)* of this definition.

"Purchase Transaction" means, collectively, any Inventory Purchase Transaction, In-Transit Purchase Transaction, or Origination Transaction.

"Purchased Commodity" means the goods specified to be purchased by Customer pursuant to a Sale Transaction Confirmation.

"Quantity" means the quantity of the Eligible Commodity in the applicable Confirmation.

"Sale Transaction" has the meaning specified in Section 2.4(a).

"Sanctioned Entity" means (a) a country or a government of a country, (b) an agency of the government of a country, (c) an organization directly or indirectly controlled by a country or its government, or (d) a Person that is a resident in a country, in each case, that is subject to a country sanctions program administered and enforced by OFAC.

"Sanctioned Person" means a Person named on the Specially Designated Nationals and Blocked Persons List maintained by OFAC or in Section 1 of the Anti-Terrorism Order, as amended.

"Services" means the services related to the production, storage, testing, pumping, and delivery of the Eligible Commodity.

"Solvent" means, with respect to any Person on any date of determination, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability

Doc ID: b10b96f1b97d89836785f3b4a78e0b71b2de0ce7

of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature, (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute unreasonably small capital, and (e) such Person is able to pay its debts and liabilities, contingent obligations and other commitments as they mature in the ordinary course of business. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"Specified Indebtedness" means any obligation (whether present, future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money or relating to the payment or delivery of funds, securities or other property (including, without limitation, collateral), other than indebtedness in respect of any bank deposits received in the ordinary course of business.

"Specified Transaction(s)" means any contract or transaction, including an agreement with respect thereto (whether or not documented under or effected pursuant to a master agreement), now existing or hereafter entered into between one Party (or any Affiliate of such Party) and the other Party (or any Affiliate of such Party).

"Storage Facility Operator" means a third party or Customer who owns or manages an Approved Storage Facility and with whom StoneX has entered into a Commodity Access Agreement.

"Stored Commodity" means the Eligible Commodity after it is sold to and purchased by StoneX in any Inventory Purchase Transaction (or any other Eligible Commodity after it is deemed to be a Stored Commodity pursuant to the terms of this Master Agreement).

"Subject Assets" has the meaning specified in Section 5.1(l).

"Subject Contract" has the meaning specified in Section 6.2(f).

"Tax" or "Taxes" shall mean all taxes, charges, duties, fees, levies or other assessments, including income, excise, property, sales or use, value added, profits, license, withholding (with respect to compensation or otherwise), payroll, employment, net worth, capital gains, transfer, social security, environmental, occupation, franchise taxes, or similar, taxes, charges or levees, whether imposed by any Governmental Authority or taxing authority anywhere in the world, including any interest, penalties and additions attributable thereto or imposed on or with respect thereto.

"Terminated Transaction" has the meaning specified in Section 7.1.

"Third Party Supplier" means any seller of Eligible Commodity under a Procurement Contract (other than Customer or any Affiliate of Customer).

"Trade Date" shall be the date on which any Transaction hereunder is executed.

"Transaction" means a transaction between StoneX and Customer for the purchase and/or sale of the Eligible Commodity pursuant to this Master Agreement.

"Transaction Documents" means, collectively, this Master Agreement, each Confirmation to the Master Agreement and each other document now or hereafter executed and/or delivered pursuant to or in connection with any of the foregoing.

"Transaction Purchase Date" shall be the date specified as such in the Confirmation (or Procurement Contract in the case of an Origination Transaction) for the applicable Purchase Transaction.

"Transaction Purchase Price" shall be the price specified as such in the Confirmation (or Procurement Contract in the case of an Origination Transaction) for the applicable Purchase Transaction.

"Transaction Sale Date" shall be the date specified as such in the Confirmation for the applicable Sale Transaction.

"Transaction Sale Price" shall be the price specified as such in the Confirmation for the applicable Sale Transaction.

"UCC" means (a) the Uniform Commercial Code, as adopted and in effect from time to time in the State of Texas, and (b) if the UCC provides that the law of another jurisdiction governs certain matters, then, in respect of such matters, the Uniform Commercial Code as adopted and in effect from time to time in such jurisdiction.

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | Amended and Restated Master Origination and Sale/Repurchase... |
| **FILE NAME** | AR Master Repo Ag...k_10.13.2022.docx |
| **DOCUMENT ID** | b10b96f1b97d89836785f3b4a78e0b71b2de0ce7 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Signed |

## Document History

| | | |
|---|---|---|
| **SENT** | **10 / 13 / 2022**<br>17:27:16 UTC | Sent for signature to Jeff Akin (jeff.akin@stonex.com), Ernesto Rambaldini (ernesto.rambaldini@stonex.com) and Thomas Bunkley III (tbunkley@caprockgrain.com) from marty.jenson@stonex.com<br>IP: 163.116.147.40 |
| **VIEWED** | **10 / 13 / 2022**<br>17:44:18 UTC | Viewed by Ernesto Rambaldini (ernesto.rambaldini@stonex.com)<br>IP: 163.116.130.21 |
| **SIGNED** | **10 / 13 / 2022**<br>17:44:54 UTC | Signed by Ernesto Rambaldini (ernesto.rambaldini@stonex.com)<br>IP: 163.116.130.21 |
| **VIEWED** | **10 / 13 / 2022**<br>19:20:55 UTC | Viewed by Thomas Bunkley III (tbunkley@caprockgrain.com)<br>IP: 98.60.107.76 |
| **SIGNED** | **10 / 13 / 2022**<br>19:21:54 UTC | Signed by Thomas Bunkley III (tbunkley@caprockgrain.com)<br>IP: 98.60.107.76 |

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | Amended and Restated Master Origination and Sale/Repurchase... |
| **FILE NAME** | AR Master Repo Ag...k_10.13.2022.docx |
| **DOCUMENT ID** | b10b96f1b97d89836785f3b4a78e0b71b2de0ce7 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Signed |

## Document History

| | | |
|---|---|---|
| VIEWED | **10 / 18 / 2022**<br>16:02:03 UTC | Viewed by Jeff Akin (jeff.akin@stonex.com)<br>IP: 163.116.147.31 |
| SIGNED | **10 / 18 / 2022**<br>16:02:26 UTC | Signed by Jeff Akin (jeff.akin@stonex.com)<br>IP: 163.116.147.31 |
| COMPLETED | **10 / 18 / 2022**<br>16:02:26 UTC | The document has been completed. |

**AMENDED AND RESTATED**
**ORGANIC GRAIN STORAGE AGREEMENT**

THIS AMENDED AND RESTATED TRI-PARTITE ORGANIC GRAIN STORAGE AGREEMENT (this "Agreement") is made December 9, 2020,  (the "Effective Date"), among FCStone Merchant Services, LLC ("FCStone"), a Delaware limited liability company with its principal  office at 1251 NW Briarcliff Parkway, Suite 800 Kansas City, Missouri 64116, Caprock Milling & Crushing, LLC ("Storage Provider and/or CapRock"), a Texas limited liability company, with its principal office at 8907 Bethlehem Blvd., Sparrows Point, Maryland 21219, and CapRock Land Company LLC ("Company"), a Texas limited liability company, whose business address is 223 North Guadalupe, # 620, Santa Fe, New Mexico, 87501 (each a "Party", collectively, the "Parties" and Storage Provider and Company collectively referred to as "Caprock").

**RECITALS**

**WHEREAS**, during the term of the relationship between the Parties, this Agreement shall be the controlling agreement with respect to the organic grain (the "Organic Grain");

**WHEREAS**, FCStone desires to store Organic Grain purchased from time to time from Company at Storage Provider's facility located at 8911 Bethlehem Boulevard, Sparrows Point, Baltimore County, MD 21219 (the "Facility");

**WHEREAS**, Company has entered into an agreement with FCStone, whereas FCStone purchases portions of Organic Grain inventory that Company has stored at the Facility and Company has relinquished any control it otherwise had while the inventory is stored at the Facility to FCStone;

**WHEREAS**, the Parties previously entered into an Organic Grain Storage Agreement, dated October 1, 2019 (the "Original Agreement"); and

**WHEREAS**, the Parties desire to amend and restate the Original Agreement as set forth herein to reflect the Parties desire to amend and update certain material terms.

**AGREEMENT**

**NOW, THEREFORE**, pursuant to the mutual promises and agreements made herein, the Parties agree as follows:

1. **Storage of Organic Grain**. Caprock shall provide discharge, storage and load out services for the Organic Grain in the Facility.  Caprock agrees handle and care for the Organic Grain in a professional manner using commercially reasonable industry best practices.

2. **Title to Organic Grain**. The Parties hereto agree that title to the Organic Grain shall remain at all times with FCStone.  Caprock represents and warrants to FCStone that the Organic Grain shall be free and clear from any security interest, liens and other encumbrances arising through Caprock during the time the Organic Grain is stored at the Facility.

3. **Control**. The Grain shall not be removed by Caprock or released to any party by Caprock without the express written consent of FCStone.

4. **Term and Fees**. FCStone shall pay the Storage Provider $1.00 per year for storage of Organic Grain. FCStone's payment obligation will become due on the first Monday of each January provided that no payment will be due if this Agreement has been terminated. FCStone shall not be charged by Storage Provider for any other service related to the Organic Grain including, but not limited to receiving, loading and handling.

5. **Lien Waivers**. To the extent Caprock has any existing liens or encumbrances on its properties which could affect FCStone's rights to the Organic Grain, Caprock shall obtain a lien waiver from any lien holder (Lien Holder), pursuant to which the Lien Holder shall waive any rights or liens which the Lien Holder may otherwise have in respect to the Organic Grain stored at the Facility. Caprock agrees not to take any action, or fail to take any action, that is inconsistent with FCStone's ownership of the Organic Grain.

6. **Designation of Storage**. Caprock agrees to prominently notate on all books and records that the Organic Grain in storage at the Facility is organic and is the property of FCStone. Furthermore, all Organic Grain owned by FCStone at the Facility shall be clearly marked or stored in a manner that makes the Organic Grain owned by FCStone at the Facility easy to identify.

7. **Access and Inspection**. FCStone and its duly authorized agents and representatives shall have the right to enter upon any location, including the Facility, at all reasonable times with or without prior notice during the term of this Agreement for the purpose of examining and inspecting the Organic Grain, or, subject to the Master Agreement, for removing the Organic Grain at FCStone's discretion.

8. **Care of Organic Grain**. Pursuant to industry best practices Caprock shall be responsible for the proper care and custody of the Organic Grain at all times, including preserving and certifying the organic integrity of the Organic Grain.

9. **Insurance.** Company shall insure the Organic Grain against casualty loss to FCStone including but not limited to coverage against loss or damage as a result of fire, lightening, tornado, wind storm, cyclone, water, inherent explosion, or any other event for full market value at the time of loss. Company shall provide FCStone with a certificate of insurance naming FCStone as loss payee with respect to all policies covering the Organic Grain.

10. **Compliance with Laws**. Caprock agrees that it will comply with all federal, state and local laws and regulations which are applicable relating to the ownership and operation of the Facility without limitation.

11. **Indemnification**. Caprock will indemnify, defend and hold FCStone harmless from liabilities, damages, claims, and expenses (including reasonable legal fees) incurred by FCStone due to (1) any breach or nonperformance by Caprock of any representation, warranty, covenant, or

agreement made by Caprock pursuant to this Agreement or (2) the negligence or willful misconduct of Caprock, its agents, employees, contractors, or invitees, including, without limitation, any loss, claim, or damage to the Grain as a result of Caprock's breach, nonperformance, negligence, or willful misconduct.

12. **Governing Law and Venue**.  This Agreement shall be governed by the laws of the State of New York without giving effect to principles of conflicts of law. The Parties irrevocably consent to the nonexclusive jurisdiction and venue of the state and federal courts located in the State of New York.

13. **Assignment.** This Agreement cannot be assigned by Caprock without the express written consent of FCStone.  This Agreement may be assigned without consent for the benefit of FCStone's creditors.  This Agreement shall be binding and insure to the benefit of the parties hereto and their successors and assigns.

14. **Amendment**. This Agreement cannot be amended or modified except by a subsequent writing signed by the Parties.

15. **Notices**. All notices provided pursuant to this Agreement shall be in writing and shall be deemed to have been delivered upon receipt. Notices may be given by hand delivered, certified or registered mail or nationally recognized overnight courier, in accordance with the following:

If to Company:

CapRock Land Company, LLC
223 North Guadalupe, # 620
Santa Fe, NM 87501

If to Storage Provider:

CapRock Milling & Crushing, LLC
223 North Guadalupe, # 620
Santa Fe, NM 87501

If to FCStone:

FCStone Merchant Services, LLC
1251 NW Briarcliff Parkway
Suite 800
Kansas City, Missouri 64116
Contracts Group
816-410-7120
DG-RKContracts@stonex.com

16. **Authority.**  The signatories hereto warrant and represent that they have the competent authority on behalf of their respective organizations to enter into the obligations of this Agreement. This Agreement may be executed in multiple counterparts, which together shall

constitute one agreement.  Signatures received by facsimile shall be considered original signatures.

**IN WITNESS WHEREOF**, the Parties hereto, intending to be legally bound hereby, have duly executed and delivered this Agreement the day and year first above written.


FCSTONE MERCHANT SERVICES, LLC

BY:_____
Name:_____
Title:_____


BY:_____
Name:_____
Title:_____


CAPROCK LAND COMPANY, LLC

By:_____
Name:_____
Title:_____

CAPROCK MILLING & CRUSHING, LLC

By:_____
Name:_____
Title:_____

# Exhibit B

ECF

# U.S. District Court
## Southern District of New York (Foley Square)
### CIVIL DOCKET FOR CASE #: 1:23-cv-07887-AT

| | |
|---|---|
| StoneX Commodity Solutions LLC v. CapRock Milling & Crushing, LLC | Date Filed: 09/06/2023 |
| Assigned to: Judge Analisa Torres | Jury Demand: None |
| Demand: $8,786,000 | Nature of Suit: 190 Contract: Other |
| Cause: 28:1332bc Diversity-Breach of Contract | Jurisdiction: Diversity |

**Plaintiff**

**StoneX Commodity Solutions LLC**
*formerly known as*
FCStone Merchant Services, LLC

represented by **Michael Schuster**
Polsinelli PC
1401 Lawrence Street
Suite 2300
Denver, CO 80202
720-931-1188
Email: mschuster@polsinelli.com
*ATTORNEY TO BE NOTICED*

**Morgan Fiander**
Polsinelli
600 Third Avenue
New York, NY 10016
212-684-0199
Email: mfiander@polsinelli.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**CapRock Milling & Crushing, LLC**

represented by **C. Zachary Rosenberg**
Rottenberg Lipman Rich, P.C.
The Helmsley Building
230 Park Avenue, 18th Floor
New York, NY 10169
212-661-3080
Fax: 646-203-0298
Email: zrosenberg@rlrpclaw.com
*ATTORNEY TO BE NOTICED*

**Mark M. Rottenberg**
Rottenberg Lipman Rich, P.C.
369 Lexington Avenue, 15th Floor
New York, NY 10017
(212)-661-3080
Fax: (212)-867-1914
Email: mrottenberg@rlrpclaw.com
*ATTORNEY TO BE NOTICED*

**Thomas Everett Chase**
Rottenberg Lipman Rich, P.C.
The Helmsley Building
230 Park Ave., 18th Floor
New York, NY 10169
212-661-3080
Email: tchase@rlrpclaw.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/06/2023 | 1 | COMPLAINT against CapRock Milling & Crushing, LLC. (Filing Fee $ 402.00, Receipt Number ANYSDC-28246278)Document filed by StoneX Commodity Solutions LLC f/k/a FCStone Merchant Services, LLC. (Attachments: # 1 Exhibit Amended and Restated Master Origination and Sale Repurchase Agreement, # 2 Exhibit Storage Agreement).(Fiander, Morgan) (Entered: 09/06/2023) |
| 09/06/2023 | 2 | CIVIL COVER SHEET filed..(Fiander, Morgan) (Entered: 09/06/2023) |
| 09/06/2023 | 3 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by StoneX Commodity Solutions LLC f/k/a FCStone Merchant Services, LLC..(Fiander, Morgan) (Entered: 09/06/2023) |
| 09/06/2023 | 4 | **FILING ERROR - SUMMONS REQUESTED - WRONG EVENT TYPE SELECTED FROM MENU -** NOTICE of Summons to Defendant re: 1 Complaint,. Document filed by StoneX Commodity Solutions LLC f/k/a FCStone Merchant Services, LLC..(Fiander, Morgan) Modified on 9/7/2023 (jgo). (Entered: 09/06/2023) |
| 09/07/2023 | | **\*\*\*NOTICE TO ATTORNEY REGARDING CIVIL CASE OPENING STATISTICAL ERROR CORRECTION: Notice to attorney Morgan Fiander. The following case opening statistical information was erroneously selected/entered: Cause of Action code 15:294; Nature of Suit code 150 (Contract: Recovery/Enforcement); Dollar Demand $8,725,521,000; County code Albany;. The following correction(s) have been made to your case entry: the Cause of Action code has been modified to 28:1332; the Nature of Suit code has been modified to 190 (Contract: Other); the Dollar Demand has been modified to $8,786,000; the County code has been modified to XX Out of State;.** (jgo) (Entered: 09/07/2023) |
| 09/07/2023 | | **\*\*\*NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney Morgan Fiander. The party information for the following party/parties has been modified: StoneX Commodity Solutions LLC f/k/a FCStone Merchant Services, LLC; CapRock Milling & Crushing, LLC. The information for the party/parties has been modified for the following reason/reasons: party role was entered incorrectly; party name was modified to add alias separately.** (jgo) (Entered: 09/07/2023) |
| 09/07/2023 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Analisa Torres. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(jgo) (Entered: 09/07/2023) |
| 09/07/2023 | | Magistrate Judge Barbara C. Moses is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (jgo) (Entered: 09/07/2023) |
| 09/07/2023 | | Case Designated ECF. (jgo) (Entered: 09/07/2023) |
| 09/07/2023 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT REQUEST FOR ISSUANCE OF SUMMONS. Notice to Attorney Morgan Fiander to RE-FILE Document No. 4 Notice (Other),. The filing is deficient for the following reason(s): the wrong event type was used to file the request for issuance of summons; the date field on the official A.O. Summons form was completed by the attorney;. Re-file the document using the event type Request for Issuance of Summons found under the event list Service of Process - select the correct filer/filers - and attach the correct summons form PDF.** (jgo) (Entered: 09/07/2023) |
| 09/07/2023 | 5 | REQUEST FOR ISSUANCE OF SUMMONS as to CapRock Milling & Crushing, LLC, re: 1 Complaint,. Document filed by StoneX Commodity Solutions LLC..(Fiander, Morgan) (Entered: 09/07/2023) |
| 09/08/2023 | 6 | INITIAL PRETRIAL SCHEDULING ORDER: Counsel for all parties are directed to submit a joint letter and a jointly proposed Case Management Plan and Scheduling Order by November 6, 2023, in accordance with Rule 16 of the Federal Rules of Civil Procedure and the instructions set forth below. (Signed by Judge Analisa Torres on 9/8/2023) (ate) (Entered: 09/08/2023) |
| 09/08/2023 | 7 | ORDER: To conserve resources, to promote judicial efficiency, and in an effort to achieve a faster disposition of this matter, it is hereby ORDERED that the parties discuss whether they are willing to consent, under 28 U.S.C. § 636(c), to conducting all further proceedings before the assigned Magistrate Judge. (Signed by Judge Analisa Torres on 9/8/2023) (ate) (Entered: 09/08/2023) |
| 09/08/2023 | 8 | ORDER: To protect the public health, while promoting the "just, speedy, and inexpensive determination of every action and proceeding," Fed. R. Civ. P. 1, it is ORDERED pursuant to Rules 30(b)(3) and 30(b)(4) of the Federal Rules of Civil Procedure that all depositions in this action may be taken via telephone, videoconference, or other remote means. It is further ORDERED pursuant to Rule 30(b) (5) that a deposition will be deemed to have taken place "before an officer appointed or designated under Rule 28" if such officer attends the deposition using the same remote means used to connect all other participants, so long as all participants (including the officer) can clearly hear and be heard by all other participants. The parties are encouraged to engage in discovery through |

| | | |
|---|---|---|
| | | remote means at every available opportunity. (Signed by Judge Analisa Torres on 9/8/2023) (ate) (Entered: 09/08/2023) |
| 09/08/2023 | 9 | ELECTRONIC SUMMONS ISSUED as to CapRock Milling & Crushing, LLC..(pc) (Entered: 09/08/2023) |
| 09/19/2023 | 10 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Michael L. Schuster to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-28310652. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by StoneX Commodity Solutions LLC. (Attachments: # 1 Affidavit Attorney Affidavit, # 2 Exhibit Certificate of Good Standing - Florida, # 3 Exhibit Certificate of Good Standing - Colorado, # 4 Proposed Order Proposed Order).(Schuster, Michael) Modified on 9/20/2023 (sgz). (Entered: 09/19/2023) |
| 09/20/2023 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 10 MOTION for Michael L. Schuster to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-28310652. Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): missing Certificate of Good Standing from Supreme Court of Florida; Affidavit not notarized;. Re-file the motion as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order. (sgz)** (Entered: 09/20/2023) |
| 09/22/2023 | 11 | AFFIDAVIT OF SERVICE of Summons and Complaint,. StoneX Commodity Solutions LLC served on 9/13/2023, answer due 10/4/2023. Service was accepted by George Martinez. Document filed by StoneX Commodity Solutions LLC..(Fiander, Morgan) (Entered: 09/22/2023) |
| 10/05/2023 | 12 | CONSENT MOTION for Extension of Time to File Answer re: 1 Complaint, . Document filed by CapRock Milling & Crushing, LLC..(Rosenberg, C.) (Entered: 10/05/2023) |
| 10/05/2023 | 13 | NOTICE OF APPEARANCE by C. Zachary Rosenberg on behalf of CapRock Milling & Crushing, LLC.. (Rosenberg, C.) (Entered: 10/05/2023) |
| 10/05/2023 | 14 | NOTICE OF APPEARANCE by Mark M. Rottenberg on behalf of CapRock Milling & Crushing, LLC.. (Rottenberg, Mark) (Entered: 10/05/2023) |
| 10/06/2023 | 15 | MOTION for Michael Lance Schuster to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by StoneX Commodity Solutions LLC. (Attachments: # 1 Affidavit Attorney Affidavit, # 2 Exhibit Certificate of Good Standing - Florida, # 3 Exhibit Certificate of Good Standing - Colorado, # 4 Proposed Order Proposed Order).(Schuster, Michael) (Entered: 10/06/2023) |
| 10/06/2023 | 16 | STIPULATION IT IS HEREBY STIPULATED and agreed, by the parties, through their undersigned counsel, that the time within which Defendant CapRock Milling & Crushing LLC may answer, move or otherwise respond to the Complaint be, and is hereby extended to from October 4, 2023 to October 12, 2023. SO ORDERED. CapRock Milling & Crushing, LLC answer due 10/12/2023., Motions terminated: 12 CONSENT MOTION for Extension of Time to File Answer re: 1 Complaint, . filed by CapRock Milling & Crushing, LLC. (Signed by Judge Analisa Torres on 10/6/2023) (jca) (Entered: 10/06/2023) |
| 10/06/2023 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 15 MOTION for Michael Lance Schuster to Appear Pro Hac Vice. Motion and supporting papers to be reviewed by Clerk's Office staff. The document has been reviewed and there are no deficiencies. (va)** (Entered: 10/06/2023) |
| 10/09/2023 | 17 | NOTICE OF APPEARANCE by Thomas Everett Chase on behalf of CapRock Milling & Crushing, LLC..(Chase, Thomas) (Entered: 10/09/2023) |
| 10/10/2023 | 18 | ORDER granting 15 Motion for Michael Lance Schuster to Appear Pro Hac Vice (HEREBY ORDERED by Judge Analisa Torres)(Text Only Order) (JSS) (Entered: 10/10/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/10/2023 12:14:52 | | |
| PACER Login: | RobsonMC | Client Code: | CapRock Milling |
| Description: | Docket Report | Search Criteria: | 1:23-cv-07887-AT |
| Billable Pages: | 4 | Cost: | 0.40 |